**UNITED STATES of America,**
**Plaintiff,**

v.

**Maurice DeShawn CALLOWAY,**
**Defendant.**

**No. CR. 02–338(RJL).**

United States District Court,
District of Columbia.

Jan. 23, 2003.

Charles Joseph Harkins, Jr., John J. Manning, Stephen Joseph Gripkey, U.S. Attorney's Office, Washington, DC, for Plaintiff.

Gregory Lawrence Poe, Crowell & Moring, L.L.P., Washington, DC, Nikki U. Lotze, Roberts & Wood, Riverdale, MD, for Defendant.

### *MEMORANDUM OPINION*

LEON, District Judge.

The defendant, Maurice DeShawn Calloway ("Calloway" or the "defendant") has

moved to suppress evidence (i.e., a pistol, ammunition and a quantity of PCP) and statements he made during the execution of a search warrant on July 11, 2002 at his grandmother's house in Southeast D.C. The Court conducted an evidentiary hearing on November 15, 2002, at which time five police officers of the Metropolitan Police Department ("MPD"), Lance Andriani, John Bevilacqua, Mark Wascavage, Howard Anderson and Sean McLaughlin, gave an extensive description of the events which occurred during the execution of the search warrant, the confrontation with the defendant, the seizure of his pistol and drugs, and his statements to the police.

Upon due consideration of the pleadings filed, the testimony of the officers, and the arguments of counsel, the Court DENIES defendant's motions to suppress both the evidence seized and the statements given to the police.

## STATEMENT OF FACTS

At approximately 7:30 a.m. on the morning of July 11, 2002, officers of the MDP and its Emergency Response Team ("ERT") forcibly entered a residence at 721 Yuma Street, S.E., Washington, D.C. pursuant to a search warrant issued on July 8, 2002 by a Superior Court judge.

The warrant had been issued to search for a 9 millimeter handgun that had been allegedly used on July 6, 2002 by the defendant's cousin, William Calloway, to threaten the life of Dominick Jackson.[1] William Calloway had already been arrested by MPD officers at the rear of his residence, the same 721 Yuma location, shortly after the altercation. The weapon he had allegedly used, however, was not on his person at the time of his arrest.

Prior to the entry on July 11, 2002, the ERT officers met for a briefing by MPD Officer Bevilacqua. Officer Bevilacqua described the alleged altercation between William Calloway and Mr. Jackson, and he informed the ERT officers that the 721 Yuma Street residence, together with another residence across the street, were locations that the MPD believed were used in the sale of narcotics.[2] In addition, Officer Bevilacqua informed the ERT officers that the defendant, Maurice Calloway, might also be residing at 721 Yuma Street. Calloway was described as just having been arrested on a homicide warrant issued by the State of Maryland.[3] To Officer Bevilacqua's knowledge, the case was still pending.[4] Accordingly, when the officers arrived that morning at 721 Yuma Street, they were prepared for the possi-

---

1. According to an affidavit made by Officer Bevilacqua to obtain the warrant, William Calloway got into a verbal dispute on July 6, 2002, at 1989 Stanton Place, S.E. at approximately 5:00 P.M., with Dominic Jackson, during which Calloway brandished a gun and pointed it at Jackson's head. William Calloway then twice activated a slide on the gun, ejecting two rounds of ammunition onto the ground. Nine millimeter ammunition was later recovered from the ground at Stanton Place, where the altercation allegedly took place. When William Calloway left the scene of the alleged assault, witnesses heard him say words to the effect of "meet me at Yuma Street." After taking Dominic Jackson's statement, MPD officers found William Calloway at the rear of 721 Yuma Street, where he

was arrested. Subsequently, Mr. Jackson identified William Calloway as his assailant.

2. Hr'g Tr. at 32 (testimony of Officer Andriani). As a safety precaution, two ERT officers were stationed outside the house across from 721 Yuma Street to monitor activity while the search was conducted of the residence.

3. Hr'g Tr. at 31 (Officer Bevilacqua testified that Officer Andriani, who normally patrolled the neighborhood surrounding 721 Yuma Street, informed him of Calloway's arrest warrant).

4. *Id.*

bility of encountering a potentially armed and dangerous man.[5] Thus, when ERT Officer Wascavage received no response to his loud kick and order to open up for police with a search warrant, they waited seven to twelve seconds before they breached the door with a two-man ram,[6] and entered the house.[7]

Upon entering the house, the officers, with weapons drawn for their safety, spread out and went into various rooms to "clear"[8]—that is survey for the presence of individuals—and secure any individuals found.[9] While Officer Wascavage cleared a room on the first floor, two other ERT officers ran up the center stairway and kicked in the door of the bedroom at the top of the stairs where Calloway was sleeping.[10] The defendant was in bed lying face down. A female companion was lying face down next to him.[11] The lead ERT officer, Sean McLaughlin, whose weapon was drawn and pointed at the individuals,[12] yelled " '[p]olice, let me see your hands,' " and instructed them to put

their hands behind their backs.[13] Both Calloway and his girlfriend made eye contact with him and immediately complied.[14] Officer McLaughlin, with a backup officer at the doorway covering him with a semiautomatic rifle, holstered his gun and proceeded to tie each individual's hands with plastic "flex cuffs." [15]

Once the individuals were secured, a "negotiator" arrived to diagram the contents of the room and obtain the names of its occupants, including the ERT officers.[16] Calloway and his girlfriend[17] provided their names, but said nothing else to the negotiator. Minutes later, MPD's non-ERT officers entered the premises. A plain clothed officer from the narcotics unit, Officer Green, proceeded to the upstairs bedroom together with two uniformed officers, Officers Anderson and Andriani.[18] ERT Officers McLaughlin and Powell remained at or near the bedroom door. Officer Green directed the defendant to roll over and sit up. Calloway, however, refused, saying: " '[n]o, you are

5. The thirteen ERT officers approached the house dressed in the ERT standard uniform: blue pants, black tactical vest with "POLICE" written across the front and back of the vest as well as on armbands, a black ballistic helmet, black arm pads and knee pads, goggles, and black gloves.

6. Officer Wascavage described the two-man ram as a "cylindrical tube four feet long with two handles on it roughly weighing about 75 pounds." *Id.* at 56.

7. Hr'g Tr. at 50–51 (testimony of Officer Wascavage).

8. *Id.* at 62 (testimony of Officer Wascavage).

9. *Id.* Officer McLaughlin explained to the Court that when he clears a room, he always flex cuffs individuals he finds, unless the person is elderly or a child, in order to ensure the safety of not only the law enforcement officers, but the occupants of the area being searched. Officer Lance Andriani's testimony confirms Officer McLaughlin, who noted that

it was standard ERT operating procedure to secure an individual's hands behind his back. *Id.* at 95.

10. *Id.* at 89 (testimony of Officer McLaughlin).

11. *Id.*

12. *Id.* at 99.

13. *Id.* at 90, 91.

14. *Id.* at 100.

15. *Id.* at 95.

16. *Id.* at 96.

17. The officers identified the woman in the defendant's room only as Miss Tatum; her first name was never provided to the Court.

18. *Id.* at 79 (testimony of Officer Anderson).

going to beat me,'"[19] or words to that effect. In response, Officer Anderson, who knew Calloway, said "'Maurice, have I ever done anything like that to you?'", and instructed the defendant to comply with Officer Green's request.[20]

As Calloway sat up, Officer Anderson began covering up his girlfriend with a blanket and assisting her from the room. While Officer Anderson was leading her out of the room, Officer Green explained to Calloway that the officers had a search warrant, and asked him a question to the effect—Is there anything in here we should know about before we tear your grandmother's house apart?[21] Calloway responded by telling Officer Green that there was a gun under the mattress.[22] Officer Green then lifted the mattress to find a 9 millimeter handgun. Moments later, while other officers were searching other parts of the room, the defendant, without prompting, further volunteered: "'Everything in the room is mine.'"[23] Shortly thereafter, one of the other non ERT officers in the bedroom found ammunition, a gun bag, and a quantity of PCP.[24] Officer Anderson testified that neither he, nor any other officer, ever brandished his weapon at the defendant at any time during the search of the bedroom at 721 Yuma Street.[25]

The defendant now seeks to suppress not only all physical evidence recovered in the search (i.e., the 9 millimeter handgun, ammunition, and the quantity of PCP[26]) but also the statements he made during the search of the bedroom. With regard to the physical evidence, the defendant argues that the warrant for the search of 721 Yuma Street was not supported by probable cause, and that the knock and announce requirement of the Fourth Amendment was violated such that the officers' initial entrance was illegal. The statements must also be suppressed, according to the defendant, because they occurred during a custodial interrogation before the defendant was read his *Miranda* warnings.

As the Court finds that probable cause existed for the search warrant and, even if it did not, the good faith exception applies, the Court DENIES defendant's motion to suppress all physical evidence seized during the search of 721 Yuma Street as fruit of the poisonous tree. The Court also DENIES defendant's motion to suppress his statements to the law enforcement officers. While Officer Green's question to the defendant may properly be viewed as interrogatory, as the government's counsel conceded in his oral argument, the pre-

**19.** *Id.* at 66 (statement of Maurice Calloway as recounted by Officer Anderson in his testimony to the Court).

**20.** *Id.* at 67. Officer Andriani confirmed Officer Anderson's recollection of his conversation with the defendant. Hr'g Tr. at 11–12 (testimony of Officer Andriani).

**21.** *Id.* at 73 (testimony of Officer Anderson); *id.* at 12 (testimony of Officer Andriani).

**22.** Officer Anderson acknowledged that he did not hear Officer Green's question or the defendant's answer himself, as he was focused on assisting Miss Tatum, but learned about it after the search from Officer Green.

Officer Andriani also acknowledged that while he heard Officer Green's question, he did not hear the defendant's response. Hr'g Tr. at 13 (testimony of Officer Andriani).

**23.** *Id.* at 71.

**24.** *Id.* at 40 (testimony of Officer Bevilacqua).

**25.** *Id.* at 74–75.

**26.** Officer Bevilacqua testified that the first item recovered in the search of 721 Yuma Street was the nine millimeter gun found under Maurice Calloway's mattress. Then, live rounds were discovered followed by a gun bag, then PCP. *See* Hr'g Tr. at 40.

arrest restraint of Calloway through the use of flex cuffs did not constitute the type of "custody" that necessitates the reading of *Miranda* warnings. Accordingly, a custodial interrogation did not occur and the defendant's Fifth Amendment rights were not violated.

## ANALYSIS

### A. Defendant's Motion to Suppress All Physical Evidence is Denied, As Probable Cause Existed for the Search Warrant.

Calloway makes a two-prong argument in support of his motion to suppress all physical evidence seized during the search of 721 Yuma Street. First, Calloway argues that the evidence must be suppressed as the affidavit for the warrant was not supported by probable cause, and that the good faith exception to the probable cause requirement does not apply to allow the introduction of the physical evidence. Second, Calloway argues that the ERT officers violated the knock and announce requirement by waiting only 7 to 12 seconds before breaching the door of 721 Yuma Street. He argues, therefore, that any evidence seized violated the Fourth Amendment.

Probable cause to support a search warrant for a residence exists "where in view of the 'totality of the circumstances,' 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Gilliam*, 167 F.3d 628, 633 (D.C.Cir.1999) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *United States v. Turner*, 119 F.3d 18, 20 (D.C.Cir.1997)). In reviewing the issuance of a warrant, this Court must find that a "substantial basis for determining the exis-

tence of probable cause" was present at the time the warrant was issued. *Gates*, at 239, 103 S.Ct. 2317. Here, the warrant was issued by Judge Murphy of the Superior Court for the District of Columbia; the Court is mindful that a state court's "'determination of probable cause should be paid great deference by reviewing courts.'"

█ A review of the facts and circumstances set forth in Officer Bevilacqua's affidavit to Judge Murphy, and the "veracity" and "basis of knowledge" of Officer Bevilacqua,[27] demonstrate that there was probable cause to believe that evidence of a crime—that is, the gun William Calloway allegedly used in the altercation—would be found at his 721 Yuma Street residence. In particular, in his affidavit in support of the application for a search warrant, Officer Bevilacqua stated that after the alleged assault on Dominick Jackson, witnesses told police that they heard William Calloway say "'meet me at Yuma Street'" as he fled the scene of the altercation. *See* Aff. of Officer Bevilacqua. Mr. Jackson, the alleged victim of the assault, confirmed the witnesses' accounts to MPD officers and stated that he could identify William Calloway. MPD officers posted a "lookout" for William Calloway, who was then stopped at the rear of 721 Yuma Street that same evening. William Calloway was placed under arrest for assault with a dangerous weapon, and was subsequently identified by Mr. Jackson as the man who had assaulted him. However, no weapon was recovered from William Calloway's person during the arrest. Finally, and perhaps most importantly for the purpose of establishing a "fair probability" that the gun would be found at 721 Yuma Street, William Calloway listed that address as his

---

27. *See Gates*, at 238, 103 S.Ct. 2317, *Id.* at 236, 103 S.Ct. 2317 (citing *Spinelli v. United*

*States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)).

place of residence at the time of his arrest. *See* Bevilacqua Aff.

■ Defendant's counsel maintains that the lapse of five days between the date of William Calloway's arrest and the date of the search precludes this Court from finding that Judge Murphy's determination—that a substantial probability existed that the gun used in the assault was in the residence at 721 Yuma Street—was reasonable. The Court disagrees. William Calloway was in police custody from the time of his arrest until the residence was searched five days later; no evidence was presented to the Court which suggested that the gun was either removed from 721 Yuma Street or that it could be in another location. Moreover, the warrant executed by Judge Murphy explicitly states that it was valid for ten days from the date of the warrant, that is, July 18. The officers searched the residence just three days after the warrant was issued, and therefore were well within the time restriction set by the judge. Given that William Calloway was arrested behind 721 Yuma Street, and that he listed 721 Yuma Street as his residence at the time of his arrest, the Court finds "a reasonable basis to infer ... that relevant evidence [would] be found in the residence." *United States v. Thomas,* 989 F.2d 1252, 1255 (D.C.Cir. 1993).[28]

■ Calloway next argues that the physical evidence seized during the search must nonetheless be suppressed because the ERT officers violated the "knock and announce" requirement of 18 U.S.C. § 3108 by waiting only seven to twelve seconds after knocking before breaching the door. According to the statute, any "officer may break open any outer or inner door ... of a house ... to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance." The knock and announce require-

28. Even if probable cause was lacking, the "good faith" exception articulated by the Supreme Court in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) permits the introduction of the evidence seized during the search of the residence at 721 Yuma Street. In *Leon,* the Supreme Court found that "when law enforcement officers have acted in objective good faith or their transgressions have been minor," and application of the exclusionary rule is not always necessary in those instances where probable cause for issuing a search warrant is lacking. *Id.* at 907, 104 S.Ct. 3405. The good faith exception of *Leon* was the product of cost-benefit analysis, where the benefit of excluding evidence was weighed against the "societal costs" of letting guilty defendants go free. *Id.* at 906–907, 104 S.Ct. 3405. However, it does not follow that the good faith exception applies in every circumstance where the officer has objectively and reasonably relied on a technically sufficient search warrant. The Court in *Leon* found that suppression of evidence is still an appropriate remedy in situations where the magistrate judge was "misled by information" that the affiant "knew was false or would have known was false except for his reckless disregard of the truth"; where the magistrate "wholly abandon[s] his judicial role"; where the affidavit for the search warrant is " 'so lacking in indicia of probable cause' " as to render belief in it " 'entirely unreasonable' "; and where the warrant is so "facially deficient" that it would be unreasonable for the officers executing the warrant to believe it was valid. *Id.* at 932, 104 S.Ct. 3405 (citing *Brown v. Illinois,* 422 U.S. 590, 610–611, 95 S.Ct. 2254, 2265–2266, 45 L.Ed.2d 416 (1975)). The Court finds that application of the *Leon* good faith exception is entirely appropriate here, where the affidavit filed in support of the application for the search warrant of 721 Yuma Street was not so lacking in probable cause as to be facially deficient or to make reliance on it unreasonable. Further, on the basis of the record before it and the testimony of Officer Bevilacqua, the Court does not believe that the information supplied in the affidavit was false. The Court therefore rejects defendant's argument that all physical evidence seized during the search must be suppressed due to the lack of probable cause.

ment of Section 3109 is part of the Fourth Amendment reasonableness inquiry. *See Wilson v. Arkansas*, 514 U.S. 927, 930, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). If the officers do not comply with Section 3109, they have necessarily violated the reasonableness requirement of the Fourth Amendment.

A "refused admittance" is not limited to an affirmative refusal, but also includes a "constructive or reasonably inferred refusal." *United States v. Bonner*, 874 F.2d 822, 824 (D.C.Cir.1989). If a person fails to respond within a reasonable time to law enforcement's notice of authority and purpose, such failure constitutes a refusal. *Id.* at 824. Here, ERT Officer Wascavage testified that the ERT team waited seven to twelve seconds before breaching the door at 721 Yuma Street, during which time he did not hear any sound emanating from the residence in response to his loud knocks and equally loud demands to open for police executing a search warrant. The defendant maintains that a seven to twelve second wait is too short to constitute constructive refusal, therefore, the ERT team's entry was a violation of the Fourth Amendment.

However, as the defendant acknowledges in his motion to suppress, the period of time between law enforcement's notice of authority and entry is not dispositive as to whether there was compliance with 18 U.S.C. § 3108. *See Bonner*, at 826 n. 6. Instead, the Court must engage in a "highly contextual analysis, examining all the circumstances of the case." *Id.* at 824. In the instant action, the search took place at or around 7:30 A.M. on a Thursday, a time of day this Circuit found in *United States v. Spriggs* to be "hardly unreasonable to assume that someone will be awake and responsive." 996 F.2d 320, 323 (D.C.Cir. 1993). At the time the ERT officers were assembled at the front door of 721 Yuma Street, they had probable cause to believe that there was at least one weapon—the handgun used by William Calloway in the alleged assault on Mr. Jackson—within the residence. The team members were also aware that the defendant often resided at 721 Yuma Street and had been recently arrested on a homicide warrant. In addition, the officers had been informed that the residence at 721 Yuma Street was thought to be a locus for drug trafficking, as was a house across the street from 721 Yuma Street. Given these circumstances, and the fact that Courts have found waits as little as five seconds to fifteen seconds to be sufficient depending on the circumstances,[29] the Court finds that the ERT officers' wait of seven to twelve seconds before entering 721 Yuma Street complied with the knock and announce requirement.[30]

---

29. In this district, the following waits between knock and announce and entry have been held sufficient given the circumstances: *Bonner* at 825 (finding that an approximate ten second wait satisfied the knock and announce statute); *United States v. Spriggs*, 996 F.2d 320, 322 (D.C.Cir.1993) (approximately fifteen seconds); *United States v. Barrett*, 725 F.Supp. 9, 11 (D.D.C.1989) (between five and ten seconds). The Seventh Circuit in *United States v. Markling* found a seven second wait to be sufficient. 7 F.3d 1309, 1318 (7th Cir. 1993).

30. The Supreme Court in *Richards v. Wisconsin* held that police officers need not comply with the knock and announce requirements when they have a "reasonable suspicion that knocking and announcing their presence, under the circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by . . . allowing the destruction of evidence." 520 U.S. 385, 394, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615 (1997). Considering the potential danger to the officers executing the warrant here, the knock and wait of seven to twelve seconds were more than adequate under the circumstances.

As the warrant was supported by probable cause, and because the good faith exception to the probable cause requirement nonetheless existed, and because the knock and announce requirement of 18 U.S.C. § 3108 was satisfied, the Court hereby DENIES defendant's motion to suppress all physical evidence (including, but not limited to, guns, ammunition and PCP) that was seized during the execution of the search warrant at 721 Yuma Street.

### B. The Defendant's Motion to Suppress Statements is Denied, as His Statements Were Not the Result of a Custodial Interrogation

Under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), statements made pursuant to a custodial interrogation and before a defendant's *Miranda* warnings have been read to him are suppressible. Before this Court can suppress Calloway's response to Officer Green and subsequent, unprompted statement in the presence of Officers Andriani and Green, the Court must determine that, in both instances, Calloway was both in custody, and subjected to interrogation.

■ Here, the government concedes that Officer Green's question as recalled by Officer Anderson as words to the effect—Is there anything in here we should know about before we tear your grandmother's house apart?—was an interrogatory question.[31] The Court agrees. In *Rhode Island v. Innis,* the Supreme Court defined "interrogation" for *Miranda* purposes to refer "not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). The

Court finds that law enforcement officer's asking an individual, in the course of executing a search warrant and while that individual is handcuffed, what they "should know about" before tearing apart a relative's residence is highly likely to elicit an incriminating response. The government does not attempt—nor could it—to argue otherwise.

■ However, the government contends that such a question is not a violation of the Fifth Amendment because Calloway, although in flex cuffs, was not in custody for *Miranda* purposes at the time the question was posed to him by Officer Green. Numerous Supreme Court cases have discussed the definition of custody under the Fifth Amendment. In *Miranda,* the Supreme Court described the custodial element of custodial interrogation as being "taken into custody or otherwise deprived of ... freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. In *Oregon v. Mathiason,* the Court clarified that a "coercive environment" does not amount to a custodial situation where *Miranda* applies "in the absence of any formal arrest or restraint on freedom of movement." 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

The Supreme Court in *California v. Beheler* best articulated the concept of "custody" for Fifth Amendment and *Miranda* purposes as it is understood and applied today. In *Beheler,* the Supreme Court held that all the circumstances surrounding an interrogation must be examined when determining whether or not an individual was in custody, but noted that *"the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275

---

**31.** *See* Hr'g Tr. at 130.

48

(1983). Subsequently, in *Berkemer v. McCarty*, the Supreme Court confirmed that a determination of custody for *Miranda* purposes hinges on whether a person "is subjected to treatment that renders him 'in custody' for practical purposes," or that the treatment is the "functional equivalent of formal arrest." 468 U.S. 420, 440, 442, 104 S.Ct. 3138, 3151 (1984). *Berkemer* also went on to confirm that the determination is an objective one; a police officer's "unarticulated plan" as to whether an individual is in custody "has no bearing on the question" of custody. Instead of focusing on the police officer's uncommunicated thoughts about custody, the Court in *Berkemer* stated that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. 3138. The objective nature of a court's custody determination was again made plain by the Supreme Court in *Stansbury v. California*, when the Court stated that custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994).

The defendant argues that the circumstances surrounding the search of his room demonstrate that he was in custody for *Miranda* and Fifth Amendment purposes when Officer Green asked his question because, under *Berkemer*, a reasonable man would have understood the situation to be a custodial one, and because he was deprived of his freedom of action in a significant way. Although the defendant is correct in arguing that a formal arrest is not required before *Miranda* applies, the circumstances surrounding the interrogation

must constitute the functional *equivalent* of a formal arrest. Calloway points to: the force used by the ERT officers to breach the front door of the house and to kick in the door to his room; the fact that ERT officers had brandished their weapons at the defendant; the fact that the defendant was handcuffed with flex cuffs; the presence of police officers "all over the place"[32]; and his belief, under those circumstances, that he was "completely at the mercy of the police"[33] and did not feel free to leave.

The Supreme Court has already held that the detention of occupants of a premises being searched by the police is not a seizure for *Fourth Amendment* purposes, as it is commensurate with the detention of suspects in a *Terry v. Ohio*[34] stop. *See Michigan v. Summers*, 452 U.S. 692, 704–05, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). Under *Summers* and *Terry*, therefore, police officers executing a search warrant can detain occupants of a residence in order to minimize the risk of harm to the officers, to prevent flight, and to facilitate the completion of the search. *Id.* at 702–03, 101 S.Ct. 2587. The question remains, however, whether individuals detained during a valid search of a premises are in custody for *Fifth Amendment* purposes. In *United States v. Clemons*, 201 F.Supp.2d 142, 144 (D.D.C.2002), Judge Paul L. Friedman noted that "the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force ... may still be permissible for Fourth Amendment purposes, while at the same time creating a 'custodial situation' under *Miranda*."

This Court concurs with Judge Friedman that it is possible that detention of

**32.** Hr'g Tr. at 119 (statement of Gregory Poe, defense counsel).

**33.** *Id.* at 121.

**34.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

occupants of a premises that is being searched may be permissible under the Fourth Amendment, but still constitute a custodial situation where *Miranda* applies. Here, however, in circumstances distinguishable from Judge Friedman's case,[35] a custodial situation under *Miranda* did not exist because there was neither a formal arrest, nor the functional equivalent of a formal arrest at the time Officer Green posed his question to the defendant. Officer Green informed the defendant that the officers were executing a search warrant. The detention in this case was not prolonged: Officer Andriani estimated that it took approximately ten minutes for ERT officers to secure the house, at which point the MPD officers immediately entered. Officers Green and Anderson arrived in Calloway's room just minutes later, at which point they asked the defendant to rollover and sit up in bed; shortly thereafter Calloway stood up from the bed, and the gun was discovered. The ERT Officers had only brandished their weapons in the defendant's presence for a momentary period of time in order to secure the defendant's bedroom. Once the room was secure, the ERT officers stopped brandishing their weapons. No other ERT or MPD officer pointed his gun at the defendant at any other time during the search. Similarly, pursuant to standard procedures, the defendant's hands were secured behind his back using temporary flex cuffs, a precaution taken to ensure the safety of the officers as well as the occupants of the residence being searched. In sum, up to that point when Officer Green asked his question, the defendant had not been treated any differently than any other person who is secured by the ERT during the execution of a search warrant. Although Officer Green's question to the defendant was interrogatory, it was not specifically focused on either the possessions of, or prior conduct by, the defendant. Indeed, it was the only time law enforcement officers had asked him a question other than to get his name. Such limited questioning, not focused specifically on the suspect's conduct or possessions, is not consistent with the type of police conduct that is the functional equivalent of an arrest. *See United States v. Saadeh,* 61 F.3d 510, 520 (9th Cir.1995) (considering the scope and duration of questioning, along with other factors, to determine whether the defendant was in custody for *Miranda* purposes). Finally, while there was a police presence at 721 Yuma Street due to officers' executing a valid search warrant, the entirety of the testimony presented at the evidentiary hearing demonstrated that the officers' attention was focused on securing the residence and finding the weapon used in the assault involving William Calloway, and was not substantially focused on the defendant, as it would have been in a formal arrest or its equivalent. Indeed, there can be little doubt that the search would have produced the handgun under the mattress, even if Officer Green had never asked his question.

---

**35.** *Clemons* was not a situation where individuals were placed in custody by officers in order to execute a valid search warrant. In *Clemons,* the defendants were stopped by MPD officers reacting to the suspicious operation of their motor vehicle. As the officers approached the vehicle, one of the defendants fled and had to be forcibly subdued; the other thereafter was forcibly removed from the vehicle, cuffed, and made to sit on the ground while the officers searched the vehicle for contraband and weapons. *After* two weapons and some ammunition were discovered in the car, one of the defendants was subjected to a series of interrogatory questions regarding not only the weapons, but the fact that the car was stolen. Any reasonable person in custody under circumstances such as these, where that individual's conduct and possessions are the focus of a series of questions, would have understood he was "in custody and not free to leave."

**50**

For the same reasons, the Court denies the defendant's motion to suppress his second statement. The second statement occurred immediately after Officer Green discovered the gun under the defendant's mattress, and just prior to the defendant exiting the room. The defendant's statement was in no way prompted by an interrogatory question from either ERT or MPD officers. In fact, the testimony presented at the evidentiary hearing unequivocally established that the officers present in the defendant's room did not engage in any conduct or speech after finding the gun that would have elicited defendant's statement. As the facts surrounding the second statement are the same as the first, this Court concludes that the defendant was neither in custody under the Fifth Amendment, nor the subject of an interrogation.

Finally, the defendant argues that his statements must be suppressed because they were not made voluntarily. This argument, too, is without merit. In *Colorado v. Connelly*, the Supreme Court held that "coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary.'" 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986). The Court does not find that the officer's conduct as they searched Calloway's room or their conduct toward him in particular constitutes "coercive" activity such that the defendant's statements were involuntary. The law enforcement officers took only precautionary, and customary, measures in securing both the residence and its occupants so that a valid search warrant could be safely executed. For the same reasons that this Court does not find that Calloway was in custody for *Miranda* purposes, it does not find that Calloway's statements were the product of coercive police activity. The Court therefore DENIES the defendant's motion to suppress

his statements on the grounds that they were involuntarily.

## CONCLUSION

For the reasons set forth above, and after considering the defendants' motions to suppress all physical evidence seized during the search of 721 Yuma Street, and to suppress his statements to law enforcement officers, the government's motions in opposition thereto, and all the evidence before the Court, the Court hereby

**DENIES** defendant's motion to suppress all physical evidence seized during the execution of a search warrant at 721 Yuma Street; and

**DENIES** defendant's motion to suppress his statements.

**SO ORDERED.**