872 A.2d 87

**Steven Terry COTTON**

v.

**STATE of Maryland.**

**No. 29, Sept. Term, 2004.**

Court of Appeals of Maryland.

April 11, 2005.

Eve L. Brensike, Asst. Public Defender (Nancy S. Forster, Public Defender, Michael R. Braudes, Asst. Public Defender, on brief), for petitioner.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

On an agreed statement of facts, petitioner, Steven Cotton, was convicted in the Circuit Court for Caroline County of possession of marijuana, for which, as a repeat offender, he was sentenced to two years in prison. That judgment was affirmed by the Court of Special Appeals. The marijuana that formed the basis of his conviction was taken from him by Caroline County Detective James Henning when Cotton, after receiving *Miranda* warnings, admitted to Henning that he had the drug in his possession. Cotton's only complaint is that, at the time of this encounter with Detective Henning, he was under an unlawful arrest and that both his admission and the ensuing search, as the fruit of that unlawful arrest, were inadmissible in evidence. We find no merit in that argument and shall therefore affirm the judgment of the Court of Special Appeals.

## BACKGROUND

An extensive four-year investigation by the Caroline County Sheriff's Office established that Don Antonio Jones, his grandfather, Calvin Edgar Bolden, and his mother, Calvileen Bolden, were operating an open-air drug market from and around their home at 329 Brooklyn Avenue, in Federalsburg. The investigation revealed that (1) significant quantities of drugs were brought into the house by Jones, (2) the drugs were being sold not only *in* the house but around it as well, from the front porch and within what we would regard as the curtilage, (3) many of the individuals observed in the trafficking, including Jones and Calvin Bolden, had extensive drug-crime records, and some of them had a record of violent crimes, and (4) Jones, in particular, (i) associated with individuals who had extensive backgrounds in assaults, attempted

murders, and handgun violations, (ii) had established an elaborate counter-surveillance network around the vicinity of the house, and (iii) had threatened that "a member of the police department is going to get 'shot' if the police do not back off with patrols in the Brooklyn, Federalsburg area."

Based on this and a great deal more, all carefully set forth in a 68–page verified application, a District Court judge found probable cause to believe that violations of the controlled dangerous substance laws were occurring "in and upon" 329 Brooklyn Avenue—not just the residence but outbuildings and motor vehicles on the property as well. Upon that finding, the court issued a warrant that authorized the police to enter and search, without the need for a knock or announcement of police presence, the residence and any outbuildings and motor vehicles located "on said property." The warrant empowered the police to search the persons and clothing of Jones, Calvileen and Calvin Bolden, and "any other persons found in or upon said premises who may be participating in violations of [those statutes] and who may be concealing evidence, paraphernalia, and Controlled Dangerous Substances," to seize all evidence "found in or upon said premises," and to arrest "all persons found in or upon said premises . . . who are participating in violations of [those statutes]."

Although only three persons were named in the warrant—Jones and the two Boldens—the affidavit established that several other people with a history of criminal and violent conduct were involved, and the warrant clearly anticipated that some of them may be on or about the property when the warrant was executed. Hence, the authorization to enter the house without knocking or announcing the police presence and to arrest "all persons" found in or upon the premises who may be participating in violations of the drug laws.[1]

---

1. Although we have recently held that there is no statutory authority for a judge, in advance, to authorize the police to enter a residence without knocking or announcing their presence, see *Davis v. State*, 383 Md. 394, 859 A.2d 1112 (2004) and *State v. Carroll*, 383 Md. 438, 859 A.2d 1138 (2004), the validity of the warrant issued in this case was not challenged

Given that they were dealing with an open-air drug market, that an unknown number of people might be present when the warrant was executed, and that some of those people might be violent and likely to resist or flee, the police understandably arrived in force. Some twenty to twenty-five officers participated.[2] When the police arrived, they found at least four people, including Jones and Cotton, in the front yard near the porch—an area in which much of the drug activity described in the application for the warrant had taken place. Jones immediately fled, requiring two officers to pursue and ultimately capture him. The other people were handcuffed and detained under guard. There was no evidence that they were held at gunpoint. Cotton was allowed to sit on a bucket or log. Detective Henning explained:

> "That is standard procedure based on being in an open air drug market and doing this type of no knock warrant, we had—everyone is detained, placed on the ground for our safety and detained at that position where they're at while the rest of the place is secured, and securing a residence doesn't just take two minutes, three minutes, it probably would take about ten to fifteen minutes to make sure that all the rooms, attics, crawl spaces, everything is secured before anyone does anything else."

The detective added that it was not just a matter of securing the house itself:

> "Basically we set up a perimeter as they are securing the house, we're setting up a perimeter, making sure no one doubles back around on us or anything to that effect, so yes, after I would say [ten to fifteen] minutes. However long it

by Cotton, and, as he was neither a resident nor found inside the house, it is not likely that he *could* challenge the "no-knock" aspect of it.

**2.** This was part of a larger operation. Jones maintained three residences—a mobile home in which he processed the drugs, the house in question on Brooklyn Avenue from which he sold the drugs, and a nearby apartment in which the police believed he actually lived. Three separate warrants for those locations were executed simultaneously, and about 50 officers were involved in the entire operation.

took to get the house totally secured is when I start making my rounds to people."

The detective explained that, once the house was secured, which took about ten to fifteen minutes, he began to interview the people who had previously been detained. He began with Steven Aldredge, who was on or near the porch with Cotton and Jones when the police arrived. Henning had what he said was a "brief conversation" with Aldredge. As Henning was talking to him, a police dog alerted to Aldredge's car. Henning requested and obtained permission to search both Aldredge and the car, and, when no contraband was found, Aldredge was promptly released. Henning then turned immediately to Cotton. He testified:

"I approached the Defendant, I told him what was going on, a search and seizure warrant was being executed. I immediately advised him of his Miranda rights, I asked him if he had anything on him, he said, 'All I've got is a bag of weed, that's all I got.' At that point I said okay, that's fine. I got all the pertinent information, he was subsequently searched behind the residence further, to determine if he had anything else and he just remained in the scene until we were able to get a transport unit there."

Henning said that he asked the question, after giving the *Miranda* warnings, to determine whether Cotton had any weapons or needles that might jeopardize Henning's safety, and that he patted Cotton down *after* Cotton's admission that he was in possession of marijuana. Henning regarded the pat-down as a *Terry v. Ohio* frisk. The marijuana that was found on Cotton is what led to his conviction for possession of the substance.

Cotton looks on this procedure as transgressing his Constitutional rights. He urges that so far as the police were concerned, he was a mere bystander who happened to be on the scene when they came to execute the warrant for the Bolden–Jones home, that they had no probable cause to believe that he had committed any crime or had any contraband in his possession, and that they therefore had no lawful

authority to detain him. The detention, he avers, constituted an unlawful arrest, and the interrogation and search that followed it were, as a result, equally unlawful. The *de facto* arrest, he says, arose from the fact that he was detained for upwards of twenty minutes, during which time he was hand-cuffed, kept under guard, and given the *Miranda* warnings.

## DISCUSSION

The Fourth Amendment does not prohibit *all* searches and seizures, but only those that are unreasonable. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985); *Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093,1096, 108 L.Ed.2d 276, 284 (1990). The starting point for a proper analysis of reasonableness is *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

As the police were about to execute a warrant to search a house for narcotics, they observed Summers coming down the front steps. The police detained him while they searched the house and, after finding narcotics in the basement and learn-ing that Summers owned the house, they arrested and searched him, finding heroin in his coat pocket. Clearly at that point they had probable cause to make the arrest, but the question before the Court—just like the question before us in this case—was the legality of the initial detention: was it an arrest that required probable cause or was it an investigative seizure that could be justified on less than probable cause?

Examining earlier cases, in particular *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its extensive progeny, the Court confirmed that "some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as the police have an articulable basis for suspecting criminal activi-ty" and that "the exception for limited intrusions that may be justified by special law enforcement interests is not confined

to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams* [*v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)]."

Of particular importance in *Summers* was the fact that the police had obtained a warrant to search the house. The Court observed that, although the detention of Summers admittedly constituted a significant restraint on his liberty, justification for that detention also had to consider the law enforcement interest, and, in that regard, it made and emphasized the point seemingly lost on both Cotton and the Dissent in this case:

> "Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. *The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.*"

*Michigan v. Summers, supra,* 452 U.S. at 702–03, 101 S.Ct. at 2594, 69 L.Ed.2d at 349–50. (Emphasis added).

Although there were a number of people found in the home and detained by the police, the *Summers* case involved only Summers himself, who was a resident. In analyzing the issue before it and ultimately holding that a limited detention of Summers was permissible, the Court sometimes used the word "resident" and sometimes the word "occupant" to describe who may properly be detained, and that has engendered considerable debate over whether anyone other than an actual resident of the home may be detained in the absence of independent probable cause or articulable suspicion. Most recently, the Supreme Court has characterized *Summers* as dealing with 'occupants.'" *See Muehler v. Mena,* 544 U.S. ——, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005).

In *Stanford v. State*, 353 Md. 527, 727 A.2d 938 (1999), we noted that three lines of cases had developed: those flatly holding that only actual residents of the home may be detained while the search proceeds; those adopting that view generally but allowing the detention of non-residents if the police "can point to reasonably articulable facts that associate the visitor with the residence or the criminal activity being investigated in the search warrant"; and those that "broadly define 'occupants' to include those visiting the residence to be searched." *Id.* at 535–38, 727 A.2d at 942–44. We pointed out that the cases in that third category tend to resolve the validity of the detention of visitors by "comparing the nature of the police intrusion with any valid law enforcement interests in the detention." *Id.* at 537–38, 727 A.2d at 943–44. Because we concluded that the detention of Mr. Stanford was unlawful under any of those approaches, we did not need to decide which of them was the most appropriate.

Since *Stanford*, it appears that at least three Federal appellate courts and one State Supreme Court have adopted approaches broader than the first and closer to the second or third. *See United States v. Photogrammetric Data Services, Inc.*, 259 F.3d 229 (4th Cir.2001), *cert. denied*, 535 U.S. 926, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (detention of employees while business office searched pursuant to warrant permissible under *Summers* ); *Ganwich v. Knapp*, 319 F.3d 1115 (9th Cir. 2003) (same); *United States v. Cavazos*, 288 F.3d 706 (5th Cir.2002), *cert. denied*, 537 U.S. 910, 123 S.Ct. 253, 154 L.Ed.2d 189 (2002); *State v. Vorburger*, 255 Wis.2d 537, 648 N.W.2d 829 (2002).

Subject to further instruction from the Supreme Court, we think that the second two approaches, or some synthesis of them, are more consistent with recent jurisprudence and represent a more reasoned and practical solution, in that they focus on the actual circumstances surrounding the issuance and execution of the warrant. Although *Summers* itself dealt only with a resident, the validity of the detention rested on

precepts derived from *Terry* and its progeny. If, to minimize the risk of harm to both police and occupants, the police are authorized to "routinely exercise unquestioned command of the situation," persons, other than just residents, who are found in or about the premises are likely to be temporarily detained as well, at least until the police can find out who they are and whether they are involved in any of the illegal activities taking place at the home.

That authority was at least implicitly confirmed in *Maryland v. Buie, supra,* where, in executing an arrest warrant for Buie, police entered his home, immediately fanned out through the home looking not just for Buie but anyone else who might be there, and continued that sweep even after Buie had been located and arrested. Reversing a contrary decision by this Court, the Supreme Court concluded that the officers had an interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring *other persons* who are dangerous and who could unexpectedly launch an attack." *Maryland v. Buie, supra,* 494 U.S. at 333, 110 S.Ct. at 1098, 108 L.Ed.2d at 285. (Emphasis added). The Court continued that "the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making the arrest" and that "[t]hat interest is sufficient to outweigh the intrusion such procedures may entail." *Id.* at 334, 110 S.Ct. at 1098, 108 L.Ed.2d at 286.

■ It follows, from *Summers* and *Buie,* that, in executing a warrant such as that issued here, for a premises known to be an open-air drug market where the police are likely to encounter people who may well be dangerous, they are entitled, for their own safety and that of other persons, to take command of the situation and, except for persons who clearly are unconnected with any criminal activity and who clearly present no potential danger, essentially immobilize everyone until, acting with reasonable expedition, they know what they are confronting. It really cannot be otherwise. The police do not know who may be at the scene when they arrive. The people

they find there, in or on the property to be searched, are not wearing identifying labels—supplier, customer, processor, bodyguard, innocent bystander. It would be decidedly *unreasonable* to expect the police simply to give a friendly greeting to the folks there and proceed to search the house without another thought as to who those people are or what they may do. Indeed, the Supreme Court has specifically warned against the very kind of "unrealistic second-guessing" of police officers that Cotton and the Dissent insist be done in assessing investigative detentions. *See United States v. Sharpe, supra,* 470 U.S. at 686, 105 S.Ct. at 1575, 84 L.Ed.2d at 616.

The question then becomes how long that detention may last. That answer was supplied in *Sharpe,* which involved the stop of a vehicle and the detention of its driver, and more recently in *Muehler v. Mena, supra,* 544 U.S. at ——, 125 S.Ct. at ——, 161 L.Ed.2d at ——. In *Sharpe,* the police had some reasonable suspicion that Sharpe and Savage, driving different vehicles in tandem, were transporting marijuana. Sharpe was stopped first while another officer pursued and eventually stopped Savage. Savage was detained until the first officer arrived—about fifteen minutes later—whereupon his truck was searched and marijuana found in it. The issue before the Court was not the validity of the initial detention but rather its length. The Court concluded:

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... *A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing* .... A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by

"less intrusive" means does not, itself, render the search unreasonable'.... The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it."

*Id.* at 686, 105 S.Ct. at 1575–76, 84 L.Ed.2d at 615–16. (Citations omitted and emphasis added).

In *Muehler*, the police, pursuant to a warrant, raided a house in which at least one member of a violent gang was thought to live. Ms. Mena, an occupant of the house, was found asleep in her bed. She was placed in handcuffs at gunpoint and, along with three other persons found in trailers behind the house, taken to a converted garage and detained under guard for two-to-three hours. When the search of the house was completed, she was released. She then sued two of the officers under 42 U.S.C. § 1983, complaining, among other things, that her detention in handcuffs violated her Fourth Amendment rights. Reversing a contrary decision by the U.S. Court of Appeals for the Ninth Circuit, the Supreme Court, relying largely on *Summers*, held that, even though the detention of Ms. Mena was more instrusive than that of Mr. Summers, "[t]he officers' use of force in the form of handcuffs to effectuate Mena's detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion." *Id.* at ——, 125 S.Ct. at ——, 161 L.Ed.2d at ——. The Court held further that the fact that the detention lasted two-to-three hours was not, itself, unreasonable, if it did not last longer than the search of the house required.[3]

Cotton places some weight—the Dissent even more—on one aspect of *Baker v. Monroe Township*, 50 F.3d 1186 (3rd Cir.1995), a split decision, without taking account of everything that the Third Circuit court said and did. *Baker* is actually instructive. Like *Muehler*, it was a § 1983 action

---

**3.** Mena also asserted that the detention did, in fact, extend beyond the time necessary to complete the search. Because the Ninth Circuit court had omitted to address that issue, the Supreme Court remanded the case for further proceedings on that claim.

stemming from the rough treatment of the Baker family during a search of the home of Mrs. Baker's son, Clementh. At about 8:30 on a June evening, Mrs. Baker, along with two of her teenage daughters and a teenage son, were approaching the home to have dinner with Clementh just as police from three jurisdictions arrived to execute a "no knock" drug raid. Some of the officers ran past them into the house, but others pointed guns at them and ordered them to the ground.

Initially, the Bakers named in their complaint only one officer, Armstrong, and the municipality that employed him, but, after the court found that Armstrong had not been involved in any wrongful conduct and entered summary judgment against them, they sought to amend their complaint to add the names of the other officers, who actually committed the allegedly wrongful conduct, which the trial court denied on limitations grounds. The principal issue on appeal was the propriety of the summary judgment in favor of Armstrong.[4]

Armstrong, one of the first officers to arrive, did order the Bakers to "get down" as he rushed into the house. The appellate court found no Fourth Amendment violation in that order. It observed that Armstrong, who was executing a "no knock" warrant, did not know who they were or whether they were entering or leaving the house but, because they were at or near the porch and he therefore suspected that they had some relationship to the house he had a warrant to search, he considered it necessary to get them on the ground to protect them from stray gunshots. Armstrong added that the presence of citizens standing in the middle of the raid could prevent the police from defending themselves, as they could not return fire in the middle of a crowd.

The court noted that "[t]he dangerousness of chaos is quite pronounced in a drug raid, where the occupants are likely to be armed, where the police are certainly armed, and the

---

**4.** When it surfaced that at least one of the Bakers was a minor at the time the complaint was filed, the appellate court remanded the case to determine whether she should be granted leave to amend her complaint.

nature of the suspected drug operation would involve a great deal of coming and going by drug customers" and, citing both *Michigan v. Summers* and *Terry v. Ohio*, concluded that "the need to ascertain the Bakers' identity, the need to protect them from stray gunfire, and the need to clear the area of approach for the police to be able to operate efficiently all made it reasonable to get the Bakers down on the ground for a few crucial minutes." *Id.* at 1191–92.

While the Bakers were outside, handcuffed and held at gunpoint by at least two officers, Mrs. Baker's purse was snatched and emptied on to the street. After about ten minutes, Armstrong ordered that the Bakers be brought inside, where they were detained, still handcuffed and at gunpoint, for another fifteen minutes. Citing *United States v. Sharpe, supra,* the court found no Constitutional violation simply because of that extended detention: "We cannot say that a detention of fifteen minutes time to identify and release a fairly large group of people during a drug raid is unreasonable." *Baker, supra,* 50 F.3d at 1192.

The problem lay in the fact that, during this entire 25–minute period, Armstrong was aware that the Bakers had been handcuffed and held at gunpoint and that Mrs. Baker's purse had been seized and emptied. The court concluded that "adding up the use of guns and handcuffs and, indeed, the length of the detention, shows a very substantial invasion of the Bakers' personal security," that the police used those methods "without any reason to feel threatened by the Bakers, or to fear that the Bakers would escape," and that "the appearances were those of a family paying a social visit, and while it may have been a visit to a wayward son, there is simply no evidence of anything that should have caused the officers to use the kind of force they [were] alleged to have used." *Id.* at 1193. If Armstrong acquiesced in that behavior, he would have violated the Bakers' Fourth Amendment rights.

Apart from whether the limited remand in *Baker* would be warranted under *Muehler,* the distinctions between *Baker* and this case are obvious. Cotton, an adult found standing next to

Jones at the porch where numerous drug transactions had been observed, could not have been mistaken for an innocent family member waiting for dinner to be served. Jones, who was known to associate with violent persons, fled and had to be chased. Not knowing Cotton, there was, indeed, reason for the police to feel threatened. Although Cotton was handcuffed until Detective Henning could speak with him, he was not held at gunpoint and he was not searched, as was Mrs. Baker, until after he admitted possessing marijuana. In short, the conduct that led the *Baker* court to conclude that summary judgment was inappropriate in the § 1983 action did not occur here. Indeed, the *Baker* court actually concluded that the kind of conduct that did occur here was *not* unlawful—not the initial detention, not the fifteen minute duration of it.

A case in point is *United States v. Maddox,* 388 F.3d 1356 (10th Cir.2004). Two Federal marshals and a deputy sheriff went to a mobile home to serve an arrest warrant on Rachel Page, a fugitive wanted for narcotics trafficking. When they arrived, they found Buhrle, the adult son of the owner of the home, in the driveway. They directed him to wait with the sheriff in the carport while the marshals went inside to arrest Page. While the marshals were inside, a truck carrying three people, including Maddox, appeared. The sheriff noticed Maddox reach under the seat but was unsure what he was doing. The sheriff had the three exit the truck and wait in the carport. Although Maddox began walking in circles in the carport, he made no attempt to escape. Eventually, three more people arrived and were held in the carport, although the sheriff then called for backup assistance. Before the backup arrived, the marshals escorted Page from the house but were required by local protocol to wait until a female officer arrived before escorting her from the area.

Upon arrival of the backup summoned by the sheriff, Maddox was separated from the others. When asked by a deputy whether he had any weapons or guns, Maddox replied that he had a concealed gun, some methamphetamine, and a scale. The deputy took possession of those items and arrested Mad-

dox. This took place about a half hour after Maddox first arrived and was detained. Maddox, like Cotton here, moved to suppress the incriminating evidence on the ground that his detention and questioning were unlawful.

Relying largely on *Maryland v. Buie,* the Tenth Circuit Court of Appeals found no Fourth Amendment violation. Although *Buie* itself involved only a protective sweep of the house, the *Maddox* court concluded that the reasoning articulated by the Supreme Court applied as well to protective detentions immediately outside the home: "Because the ability to search for dangerous individuals provides little protection for officers unless it is accompanied by the ability to temporarily seize any dangerous individuals that are located during the search, we conclude that detaining potentially dangerous persons for the duration of the arrest qualifies as a 'reasonable step [ ] to ensure the [officers'] safety.'" *Maddox, supra,* 388 F.3d at 1362, quoting in part from *Buie.*

The court noted that the sweep permitted in *Buie* was of the "arrest scene," which, in the *Maddox* case, included the area immediately adjacent to the home. Like Cotton, Maddox, invoking *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), urged that he was a mere bystander and that the sheriff should have simply sent him on his way. The court rejected that argument. In *Ybarra,* the police, in the course of executing an arrest warrant for the bartender of a tavern, proceeded to search all of the patrons of the tavern, which the Court held was impermissible—that "a person's mere propinquity to others independently suspected of criminal activity does not, *without more,* give rise to probable cause to search that person." *Ybarra, supra,* 444 U.S. at 91, 100 S.Ct. at 342, 62 L.Ed.2d at 245. (Emphasis added). The circumstances in the case before it led the *Maddox* court to conclude that there *was* more there—that *Buie* was the more relevant case—and it concluded that the sheriff had a reasonable articulable suspicion that Maddox posed a potential danger to the officers and that suspicion supported the temporary protective detention. *See also United States v. Vite–Espino-*

*za,* 342 F.3d 462, 467 (6th Cir.2003); *United States v. Guadar-rama,* 128 F.Supp.2d 1202, 1217 (E.D.Wis.2001).

This Court has recognized that society has become more violent, that attacks against law enforcement officers have become more prevalent, that there is a greater need for police to take protective measures to ensure their safety and that of the community that might have been unacceptable in earlier times, and that *Terry* has been expanded to accommodate those concerns. In *In re David S.,* 367 Md. 523, 534, 789 A.2d 607, 613 (2002), we quoted with approval this passage from *United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir.1994):

> "The last decade has witnessed a multifaceted expansion of *Terry,* including the trend granting officers greater latitude in using force in order to neutralize potentially dangerous suspects during an investigatory detention. For better or worse, the trend has led to the permitting of the use of handcuffs, for the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention."

Our approval of "hard takedowns" in *David S.* and in *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988), as permissible *Terry* detentions rather than as arrests, confirms our acceptance of that observation. *See also Dashiell v. State,* 374 Md. 85, 821 A.2d 372 (2003).

██ Cotton's reliance on Detective Henning's recitation of the *Miranda* warnings before questioning him as evidence that an arrest had already occurred also finds little support either in logic or in the case law. The prophylactic require-ment of *Miranda* warnings is designed to safeguard important Fifth Amendment protections. *See Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Although the giving of those warnings may be considered along with more relevant factors as part of all that occurred, it should have no special significance in determining whether a temporary detention constitutes an arrest for Fourth Amend-

ment purposes because it may well be required even when there is clearly no arrest.

■■■ *Miranda* warnings need to be given whenever there is a custodial interrogation, and a custodial interrogation can arise from a pure *Terry* stop that never crosses into an arrest. *See United States v. Smith,* 3 F.3d 1088 (7th Cir.1993), *cert. denied,* 510 U.S. 1061, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994); *United States v. Perdue,* 8 F.3d 1455 (10th Cir.1993); *United States v. Clemons,* 201 F.Supp.2d 142 (D.D.C.2002); *United States v. Calloway,* 298 F.Supp.2d 39 (D.D.C.2003). Understanding that, courts have made clear that a cautious or gratuitous recitation of *Miranda* warnings is irrelevant to whether there has been an arrest, or even a custodial interrogation. *Cummings v. State,* 27 Md.App. 361, 341 A.2d 294 (1975); *Sydnor v. State,* 39 Md.App. 459, 387 A.2d 297 (1978); *Com. v. Alicea,* 376 Mass. 506, 381 N.E.2d 144, 149–50 (1978); *People v. Wipfler,* 68 Ill.2d 158, 11 Ill.Dec. 262, 368 N.E.2d 870 (1977); *People v. Dozier,* 67 Ill.App.3d 611, 24 Ill.Dec. 388, 385 N.E.2d 155, 158 (1979); and *cf. United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1222 (11th Cir.1993).[5] Indeed, if the police proceed to interrogate a person seized and temporarily detained pursuant to *Terry* and do not give *Miranda* warn-

---

**5.** *Diaz–Lizaraza* is particularly instructive. Federal agents made a good *Terry* stop and asked Diaz for identification. When he responded, one of the agents recognized his voice as that of someone who had previously identified himself as "George," and whom the agent knew had been intimately involved in the drug transaction they were investigating. At that point, the agents gave Diaz *Miranda* warnings, searched his truck, discovered a beeper that had the same number as "George's" beeper, and then formally arrested him. The court found that the *Terry* stop became an arrest once Diaz was voice-recognized as "George," because at that point the agents had no intention of releasing him. In addressing the relevance of the *Miranda* warnings on that point, the court noted that "Mirandizing a detainee does not convert a *Terry* stop into an arrest, but *in this case* it is evidence that the nature of the detention had grown more serious *and that the agents did not intend to release Diaz from their custody." Diaz–Lizaraza, supra,* 981 F.2d at 1222. (Emphasis added). Here, of course, the *Miranda* warnings were given *before* Detective Henning questioned Cotton, and the evidence was that, at that point, but for Cotton's voluntary admission that he was carrying contraband, he *would* have been released, as was Aldredge.

ings, any incriminating evidence revealed by that interrogation may, depending on the circumstances, be held inadmissible as the product of a custodial interrogation and thereby doom the validity of an ensuing arrest based on that evidence. The law should encourage police to give those warnings when questioning a suspect, not discourage them by regarding the warnings as converting a good *Terry* stop into a bad arrest.

In summary, Cotton's reliance on the facts that he was handcuffed, placed under guard, and given *Miranda* warnings as establishing that he was *de facto* arrested either upon his initial detention or after fifteen to twenty minutes of it finds no substantial support in either Federal or this Court's current jurisprudence. Acceptance of that view would place both police officers and innocent bystanders at considerable risk.

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**

BELL, C.J., BATTAGLIA, and GREENE, JJ., dissent.

Dissenting Opinion by BATTAGLIA, J. which BELL, C.J. and GREENE, J., join.

I dissent. This case involves the detention and search of a nonresident who was outside of a dwelling during the execution of a "no-knock" warrant. The Majority is, despite its protestations to the contrary, adopting an overly broad interpretation of *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), so that a person present **anywhere** outside on property where a search warrant is executed may be detained in the absence of independent probable cause or individualized reasonable articulable suspicion. I would find, however, that because the police could not enumerate any articulable facts creating individualized reasonable suspicion to support their detention, Cotton was subject to an unlawful *de facto* arrest, under the totality of the circumstances presented in this case.

On February 21, 2002, at approximately 4:00 p.m., the Caroline County Drug Task Force [hereinafter "Drug Task Force"], in conjunction with the Maryland State Police Tacti-

cal Unit [hereinafter "Tactical Unit"], executed a "no-knock" warrant at 329 Brooklyn Avenue in Federalsburg, Maryland. The issuance of the warrant was based upon surveillance by Detective James Henning of the Caroline Drug Task Force, who concluded that the residence was being used as an open air drug market and that three individuals resided there: Don Antonio Jones, Calvileen Denise Bolden, and Calvin Edgar Bolden, all of whom were named in the affidavit.

When the Drug Task Force and Tactical Unit arrived at 329 Brooklyn Avenue, police observed four people, two of whom were Jones and Cotton, standing together outside the home within two or three feet of the front porch. When the twenty to twenty-five police officers approached the home, Jones fled on foot, while the others, including Cotton, remained. The police detained everyone present, placed them in handcuffs, and entered the residence with guns drawn.

Detective Henning did not interview Cotton until the property was secured, at least ten to twenty minutes after Henning's arrival. During that time, Cotton was guarded by at least one officer while seated on a log or a bucket. Detective Henning advised Cotton of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked whether he had any weapons or other objects that "would hurt [Detective Henning] or anything else that he wasn't supposed to have." Cotton stated that he was carrying a bag of marijuana. Detective Henning frisked Cotton for weapons and found none; however, he did recover a bag of marijuana from Cotton's pocket. At that time, Cotton was formally arrested.

## I.

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated...." U.S. CONST. amend. IV. The Fourth Amendment is not, however, a guarantee against all searches and

seizures, only those that are unreasonable. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985). "Generally, any seizure of a person, whether by arrest or detention, must be supported by probable cause." *Stanford v. State*, 353 Md. 527, 532, 727 A.2d 938, 941 (1999), citing *Summers*, 452 U.S. at 700, 101 S.Ct. at 2593, 69 L.Ed.2d at 348; *Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824, 832–33 (1979). The Supreme Court, however, has created "certain exceptions to the probable cause requirement." *Stanford*, 353 Md. at 532, 727 A.2d at 941. These include a "stop and frisk" under *Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968), where the police have "reasonable suspicion that the suspect is engaged in criminal activity and presently armed and dangerous." *Stanford*, 353 Md. at 532, 727 A.2d at 941; *see also United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 616 (1975) (holding that Border Patrol agents may lawfully stop persons they reasonably suspect of being illegal immigrants and question them about their citizenship); *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972) (extending the holding of *Terry* to a stop based on a reliable informant's tip that the defendant might be armed and carrying illegal drugs).

The Supreme Court also created an exception in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), where the Court found that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is being conducted." *Id.* at 705, 101 S.Ct. at 2595, 69 L.Ed.2d at 351. In so doing, the Court noted three law enforcement justifications for such a detention: (1) preventing the suspect from fleeing should contraband be found; (2) "minimizing the risk of harm to the officers"; and (3) gaining the assistance of the "occupants" to facilitate an orderly and quick search, for example by opening locked doors or containers. *Id.* at 702–03, 101 S.Ct. at 2594, 69 L.Ed.2d at 349–50. The Court, however, left open the question of who

can properly be characterized as an "occupant," and, as we noted in *Stanford,* there now exists a split of authority in many jurisdictions as to the scope of *Summers. Stanford,* 353 Md. at 535, 727 A.2d at 942.

In *Stanford,* we noted that there are three different approaches to applying *Summers. Id.* First, some jurisdictions limit *Summers* solely to the actual residents of the premises being searched. *See, e.g., United States v. Reid,* 997 F.2d 1576, 1579 (D.C.Cir.1993), *cert. denied,* 510 U.S. 1132, 114 S.Ct. 1105, 127 L.Ed.2d 417 (1994); *State v. Carrasco,* 147 Ariz. 558, 711 P.2d 1231, 1234 (1985); *State v. Williams,* 665 So.2d 112, 115 (La.Ct.App.1995); *People v. Burbank,* 137 Mich.App. 266, 358 N.W.2d 348, 349 (1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 962, 83 L.Ed.2d 967 (1985); *Lippert v. State,* 664 S.W.2d 712, 720 (Tex.Crim.App.1984). Another group of jurisdictions has held that a visitor to the property may not be detained under *Summers* unless "the police can point to reasonably articulable facts that associate the visitor with the residence or the criminal activity being investigated in the warrant." *Stanford,* 353 Md. at 536, 727 A.2d at 943. To determine whether such a connection exists, these cases have recognized "that police must make a minimal intrusion to ascertain the visitor's identity." *Id.; see, e.g., Baker v. Monroe Township,* 50 F.3d 1186, 1192 (3d Cir.1995); *United States v. McEaddy,* 780 F.Supp. 464, 471 (E.D.Mich.1991), *aff'd sub nom. United States v. Fountain,* 2 F.3d 656 (6th Cir.), *cert. denied,* 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993); *People v. Glaser,* 11 Cal.4th 354, 45 Cal.Rptr.2d 425, 902 P.2d 729, 734 (1995); *Claffey v. State,* 209 Ga.App. 455, 433 S.E.2d 441, 442 (1993), *aff'd,* 211 Ga.App. 335, 439 S.E.2d 516 (1993); *State v. Graves,* 119 N.M. 89, 888 P.2d 971, 974 (1994); *State v. Schultz,* 23 Ohio App.3d 130, 491 N.E.2d 735, 739 (1985); *State v. Curtis,* 964 S.W.2d 604, 612–14 (Tenn.Crim.App.1997); *State v. Broadnax,* 98 Wash.2d 289, 654 P.2d 96, 103 (1982). Finally, a third group of jurisdictions defines "occupant" most broadly to include all visitors within a dwelling, or viewed leaving it, provided that the law enforcement interests at stake outweigh the level of the police intrusion. *See, e.g., United*

*States v. Pace,* 898 F.2d 1218, 1239 (7th Cir.1990), *cert. denied,* 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990) (noting that Pace was detained within the building subject to the warrant); *United States v. Taylor,* 716 F.2d 701, 707 (9th Cir.1983) (permitting the detention of the visitor who was observed leaving the dwelling); *State v. Phipps,* 528 N.W.2d 665, 668 (Iowa Ct.App.1995) (same).

The Majority claims to be adopting a "synthesis" of the latter two approaches: one requiring "reasonably articulable facts that associate the visitor with the residence or criminal activity being investigated in the search warrant," *Stanford,* at 536–37, 727 A.2d at 943, and the other permitting any visitor to the premises to be searched if the "valid law enforcement interests" outweigh "the nature of the police intrusion." *Id.* at 538, 727 A.2d at 944. Ultimately, after applying this test, the Majority concludes that the inherent threat to police safety during the execution of this warrant permitted the police to detain Cotton during the search. This conclusion, however, mischaracterizes the circumstances surrounding Cotton's detention.

I agree with the Majority that the appropriate standard should require reasonable articulable suspicion.[1] The Majori-

---

1. In *State v. Nieves,* 383 Md. 573, 589–91, 861 A.2d 62, 72–73 (2004), we said of "reasonable articulable suspicion," it is:

   being more than a " 'mere hunch' but is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. In discussing the concept of reasonable suspicion, the United States Supreme Court has opined that, '[a]rticulating precisely what "reasonable suspicion" and "probable cause" mean is not possible,' but such terms are 'commonsense, nontechnical conceptions that deal with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." ' " A determination of whether reasonable suspicion exists to justify a search is made by looking at the totality of the circumstances. In this regard, the Court stated:
   When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and

ty, in support of its conclusion that reasonable articulable suspicion existed and that the threat to police safety was so great as to justify detaining everyone inside the dwelling and outside on the property, states:

> [I]n executing a warrant such as that issued here, for a premises known to be an open-air drug market where the police are likely to encounter people who may well be dangerous, they are entitled, for their own safety and that of other persons, to take command of the situation and, except for persons who are clearly unconnected with any criminal activity and who clearly present no potential danger, essentially immobilize everyone until, acting with reasonable expedition, they know what they are confronting.

Maj. op. at 258–59, 872 A.2d at 92. Although the Majority pays lip service to the standards of reasonable articulable suspicion and the use of a balancing test for comparing the law enforcement interests against those of the individual, it is actually creating a standard by which all individuals present are presumed suspicious, and in which the person being detained bears the burden of proving a lack of wrongdoing. Cotton, who was outside the house, did not give the police any reason to suspect that he posed a danger to them, that he was involved in criminal activities when police arrived at the property, did not flee, and cooperated fully with instructions from the officers who handcuffed him and sat him on the ground. Under these circumstances, would, then, a person with a diaper bag and toddler in tow, or a teenager with a book bag curious about the scene have been suspected of posing a danger to police or possibly being involved in criminal activity? There was no indication from his conduct or appearance that Cotton possessed weapons or contraband. One would be hard pressed to imagine other conduct by which

---

deductions about the cumulative information available to them that "might well elude an untrained person."
(Internal citations omitted).

Cotton could have proven that he posed no danger to the police.

It is disingenuous to assert that the danger posed to police under such circumstances was of such magnitude as to warrant the detention of all persons merely present in some capacity on the premises. Surely, the overwhelming number of officers on the small property dispelled any such need to engage in a wholesale detention. In light of the overwhelming number of officers at the scene and the diminutive size of the property, the Majority cannot in good faith argue that the threat to police outweighed Cotton's interest in being free from a warrantless seizure. Moreover, apart from the characterization of the premises as an "open-air drug market," and Cotton's presence thereon, the Majority can point to no facts specific to Cotton that would give rise to reasonable articulable suspicion that Cotton posed a danger to them. As the Supreme Court stated in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91, 100 S.Ct. at 342, 62 L.Ed.2d at 245. Therefore, I can find no justification under the Majority's so-called "hybrid" test under *Summers.*

Furthermore, the Majority's position is troubling in that it provides no guidance as to the spatial boundaries beyond which *Summers* no longer applies. In the present case, Cotton was detained outside of the building, but still on the property. Although Cotton was only a few feet from the front door, the Majority provides no guidance as to whether the result would have been the same if Cotton had been standing on the sidewalk in front of the residence, on public property, or if he had been a common carrier merely delivering a package or food to the house and had the misfortune of being present when the warrant was executed. Under the Majority's reasoning there is no apparent check on the power of police to detain anyone, regardless of their obvious lack of any meaningful connection to the property and the persons upon whom the warrant is being executed. Although it claims to be relying on reasonable articulable suspicion and a balancing

test, the Majority has not pointed to a single fact beyond Cotton's presence to justify its conclusion.

In *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), the Supreme Court recognized the important distinction between a confined space and one that is incrementally larger with respect to the existence of probable cause: "[A] car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 373, 124 S.Ct. at 801, 157 L.Ed.2d at 776–77. The same difference operates in the facts of the case *sub judice.* Absent an indication that Cotton was in possession of contraband or weapons prior to his detention, his mere presence is not sufficient to create a nexus with the underlying reasons of the warrant so as to justify his detention when he is neither an occupant of a vehicle or a dwelling.[2] To hold otherwise would effectively render the reasonable articulable suspicion requirement for a lawful *Terry* stop a nullity.

In support of its conclusion, the Majority cites the recent Supreme Court case of *Muehler v. Mena*, 544 U.S. ——, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005), as so analogous to the case at bar as to mandate the conclusion that Cotton's detention was lawful. There is, however, a significant difference between the circumstances in *Muehler* and those in the present case. The facts in *Muehler* are as follows:

At 7 a.m. on February 3, 1998, [the officers whom Ms. Mena sued], along with the SWAT team and other officers, executed a warrant. Mena was asleep in her bed when the SWAT team, clad in helmets and black vests adorned with badges and the word "POLICE," entered her bedroom and placed her in handcuffs at gunpoint. The SWAT team also handcuffed three other individuals found on the property. The SWAT team then took those individuals and Mena into a

---

2. The spatial aspect of arrests of individuals in vehicles continues to pose significant questions, even after *Pringle.* 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

converted garage, which contained several beds and some other bedroom furniture. While the search proceeded, one or two officers guarded the four detainees, who were allowed to move around the garage but remained in handcuffs.

*Muehler,* 544 U.S. at ——, 125 S.Ct. at 1468, 161 L.Ed.2d at ——. Ms. Mena was discovered asleep in a **bedroom** at 7 a.m. in a home owned by her family. The fact that she was in the house creates a significant connection between her and the property, unlike Mr. Cotton.

Conversely, in the case *sub judice,* Cotton was apprehended outside the dwelling on the premises, and police had never observed him there during their years of surveillance. There was absolutely no fact other than Cotton's presence at the location during the time of the execution of the warrant connecting him to the home or the wrongdoing that allegedly occurred there. Under the circumstances in *Muehler,* Ms. Mena was clearly more than a passing visitor to the home, the residence of a gang member suspected of being involved in a drive-by shooting, so that the level of force used by police and the length of the detention could reasonably be justified as necessary for police safety. Those same connections do not exist in the present case and as such, a similar level of force cannot be supported on these facts.

## II.

The United States Supreme Court in *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), set forth the test used to determine whether a person has been "seized" within the meaning of the Fourth Amendment. *Id.* at 573, 108 S.Ct. at 1979, 100 L.Ed.2d at 571–72. That test establishes that "the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.,* quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980). Whether a seizure is a *de facto*

arrest turns on whether there was a " 'restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994), quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983), quoting in turn *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977).

In *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Supreme Court applied its test for seizure and arrest under the Fourth Amendment and found that Dunaway's seizure constituted a *de facto* arrest because, "although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave." *Id.* at 203, 99 S.Ct. at 2252, 60 L.Ed.2d at 830. Dunaway was taken to the police station in a police car, was not aware that he was "free to go," and would have been physically restrained had he attempted to leave. *Id.* According to the Court, these circumstances clearly indicated that Dunaway was not being detained as envisioned in *Terry,* but rather, was subject to an arrest. *Id.* Moreover, the Court stated that "differences in form [of a *de facto* arrest] must not be exalted over substance." *Id.* at 215, 99 S.Ct. at 2258, 60 L.Ed.2d at 827.

Generally, this Court has defined an arrest as "the taking, seizing or detaining of the person of another, *inter alia,* by an act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest." *Barnhard v. State,* 325 Md. 602, 611, 602 A.2d 701, 705 (1992), quoting *Little v. State,* 300 Md. 485, 510, 479 A.2d 903, 915 (1984), quoting in turn *Morton v. State,* 284 Md. 526, 530, 397 A.2d 1385, 1388 (1979). The action indicating an intention to take into custody includes the "touching or putting hands on [the suspect]." *Bouldin v. State,* 276 Md. 511, 515–16, 350 A.2d 130, 133 (1976). In determining whether an investigatory detention is actually an arrest requiring probable cause, courts must consider the "totality of the circumstances." *See In re David S.,* 367 Md. 523, 535, 789 A.2d 607, 614 (2002); *Ferris v. State,* 355 Md. 356, 376, 735 A.2d 491, 501 (1999). Under the totality of the circumstances,

we have recognized that no single factor is dispositive. *See In re David S.,* 367 Md. at 535, 789 A.2d at 614; *Ferris,* 355 Md. at 376, 735 A.2d at 501.

Recently, in *In re David S.,* this Court was asked to determine whether "the seizure of David S. was tantamount to an arrest requiring probable cause," or whether it amounted to a *Terry* stop. *Id.* at 528, 789 A.2d at 609. In that case, police were conducting surveillance and observed David S. come from behind a building, show an object to his companion, who was believed to be a drug dealer, and stuff the object into his waistband. *Id.* at 530, 789 A.2d at 611. Police believed the object to be a weapon, and therefore, stopped David S. and his companion, forced them to lie face down on the ground, and handcuffed them. *Id.* With guns drawn, the officers searched David S. *Id.* After one officer felt what was believed to be a gun, he removed the object from David S.'s waistband. *Id.* Upon opening a bag containing the object, the police found cocaine. *Id.*

On appeal, this Court determined that the police had reasonable suspicion, supported by articulable facts, to believe that David S. had committed, or was attempting to commit, a crime, and that he had a gun in his waistband. *Id.* at 539, 789 A.2d at 616. Moreover, we held that the stop was not tantamount to a formal arrest because the police reasonably believed David S. posed a threat to their safety so as to justify the use of force under *Terry.* *Id.* Therefore, under the totality of the circumstances, we determined that although the intrusion was severe, it did not convert the investigatory stop into the equivalent of a formal arrest under the Fourth Amendment. *Id.* at 539–40, 789 A.2d at 611.

Similarly, the facts in *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988), are also instructive as to those circumstances found insufficient to convert an investigatory stop into an arrest. In *Lee,* police, responding to an anonymous tip providing specific information about the presence of weapons and the suspects' involvement in a violent crime, conducted surveillance of a group of men playing basketball. *Id.* at 651, 537 A.2d at 239.

Police, some of whom were armed, swarmed the basketball court and ordered the men to "lie face down on the ground." *Id.* The officers frisked the young men, and one of the officers found a gun in a gym bag that had been described by the anonymous informant. *Id.* Lee and two other men were arrested. *Id.* at 652, 537 A.2d at 239.

After analyzing the reliability of the information provided by the anonymous informant, this Court determined that the informant's information provided the police with a "high degree of reasonable and articulable suspicion that the [suspects] were the robbers and were carrying a handgun in the gym bag." *Id.* at 657, 537 A.2d at 242. Ultimately, we held that because the police had reliable information that the suspects were armed, and the detention lasted no more than two minutes, the use of guns and a hard take down were justified. *Id.* at 667, 537 A.2d at 247. Therefore, we determined that the detention was proper under *Terry* and did not rise to the level of a *de facto* arrest. *Id.*

In *State v. Evans*, 352 Md. 496, 723 A.2d 423 (1999), we concluded that under the totality of the circumstances, the detention at issue was a *de facto* arrest. Officer Rowell, as part of a police operation, purchased a dime-bag of cocaine from Evans using traceable currency. *Id.* at 501, 723 A.2d at 425. The two then parted ways, and Officer Rowell called other officers in the vicinity to stop Evans. *Id.* The officers searched Evans and recovered the marked bill from Officer Rowell and nine vials of cocaine. *Id.* at 502, 723 A.2d at 425. The police did not take Evans to the police station nor did they formally charge him. *Id.*, 723 A.2d at 426. When Evans was eventually formally arrested, he was charged and convicted of distribution of cocaine and possession of cocaine with an intent to distribute. *Id.* at 503, 723 A.2d at 426.

After considering the totality of the circumstances, we determined that Evans's detention was tantamount to a formal arrest. *Id.* at 515, 723 A.2d at 432. To support our conclusion, we emphasized that Evans was physically restrained, subject to police custody and control, detained for a significant

period of time until his identity could be verified, and searched and photographed. *Id.* at 515, 723 A.2d at 432. Based on those facts, we stated that "the initial [detention] of [Evans] by the police constituted [an arrest]." *Id.* We did not, however, find that arrest to be illegal because we determined that the arrest, although not formal, was supported by probable cause. *Id.* at 515–16, 723 A.2d at 432.

Like our conclusion in *Evans* and distinguishable from our decisions in *David S.* and *Lee,* in the case at bar, I believe that under the totality of the circumstances the "investigatory detention" of Cotton was tantamount to an arrest because the restraints on his freedom and the conduct of the police were consistent with a formal arrest.

Specifically, twenty to twenty-five officers descended upon 329 Brooklyn Avenue, a dwelling and surrounding property which "was not very big." Cotton was standing two to three feet from the front door, where in accordance with police procedure, officers were entering with their weapons drawn. Cotton was handcuffed and sat on a log or bucket near the front porch of the residence, while being guarded by at least one officer. When Detective Henning approached Cotton, he read him his *Miranda* rights. Detective Henning testified that Cotton was cooperative and that there was nothing from Cotton's appearance to indicate that he possessed contraband or weapons of any sort. Considering the totality of the circumstances, as they appeared to the officers at the time, handcuffing Cotton, placing him under police guard, and *Mirandizing* him, in the presence of an overwhelming number of officers, without reasonable articulable suspicion that Cotton was in possession of contraband or weapons, was tantamount to an arrest.

The Majority relies upon the Supreme Court's decision in *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), for the proposition that a twenty-minute stop is not a *de facto* arrest. This reliance is misplaced. When the Supreme Court in *Sharpe* determined that the twenty-minute stop at issue was not unreasonable, it was not

announcing a *per se* rule, as the Court's opinion emphasized. In *Sharpe*, police were following a suspicious car and truck on the highway. *Id.* at 678, 105 S.Ct. at 1571, 84 L.Ed.2d at 610. When the police indicated to the driver of the car to pull over onto the shoulder, the truck fled the scene, narrowly missing a patrol car. *Id.* On appeal, Sharpe challenged the length of the *Terry* stop as indicative of a *de facto* arrest. *Id.* at 683, 105 S.Ct. at 1574, 84 L.Ed.2d at 613. The Supreme Court stated that in making its determination, it was "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during the time it was necessary to detain the defendant." *Id.* at 686, 105 S.Ct. at 1575, 84 L.Ed.2d at 615–16. The question, as stated by the Court, was "whether the police acted unreasonably in failing to recognize or pursue [an alternate, less intrusive means]." *Id.* at 687, 105 S.Ct. at 1576, 84 L.Ed.2d at 616. Ultimately, the Supreme Court concluded that the delay in the detention was the result of the actions of Sharpe and his co-defendant rather than an unreasonable failure to recognize any alternate, less intrusive means. *Id.* at 687–88, 105 S.Ct. at 1576, 84 L.Ed.2d at 616. In the present case, the twenty-minute delay is one more indicia, in a host of factors, that collectively yield the conclusion that Cotton was under arrest.

In a case factually similar to the one at bar, *Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir.1995), an action brought under 42 U.S.C. § 1983 (2000), the United States Court of Appeals for the Third Circuit concluded that the detention at issue was also a *de facto* arrest. In that case, the Bakers were outside the home of Clementh Griffin, Mrs. ·Baker's son, when police descended upon the property to execute a "no-knock" search warrant. *Id.* at 1188. As the Bakers approached the front door, police officers ran in front of them with guns drawn, shouting, "Get down." *Id.* at 1189. The Bakers were then forced to the ground and remained there, handcuffed, for twenty-five minutes. *Id.* Members of the Baker family were then subjected to a search. *Id.*

Examining the totality of the circumstances, the Third Circuit determined that "the use of guns and handcuffs and, indeed, the length of the detention, shows a very substantial invasion of the Bakers' personal security." *Id.* at 1193. Moreover, the court held that "there [was] simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used." *Id.* Therefore, the court determined that the facts of the case would support a finding that the Bakers' Fourth Amendment rights were violated.

The Majority, in its analysis concerning the circumstances surrounding Cotton's detention, is particularly persuaded by the Court of Appeals for the Tenth Circuit's reasoning in *United States v. Maddox*, 388 F.3d 1356 (10th Cir.2004). See Maj. Op. at 15–16. The facts before the Tenth Circuit in *Maddox* are easily distinguishable from those in the case at bar. Maddox exhibited erratic and potentially violent behavior both prior to and during his detention, leading an officer at the scene to consider him "a critical and deadly threat" to the officers' safety. *Id.* Conversely, here, Cotton was compliant with the officer's demands, was not behaving abnormally, and the officers on the scene had no specific reason to believe that he posed any danger to their safety beyond his mere presence at the scene. Moreover, Maddox was not handcuffed or *Mirandized,* whereas Cotton was in this case.

The Majority attempts to characterize various courts, including the Court of Special Appeals, as stating, unambiguously, that "a cautious or gratuitous recitation of *Miranda* warnings is irrelevant to whether there has been an arrest," and cites *Sydnor v. State,* 39 Md.App. 459, 387 A.2d 297 (1978); *Cummings v. State,* 27 Md.App. 361, 341 A.2d 294 (1975); *Com. v. Alicea,* 376 Mass. 506, 381 N.E.2d 144, 149–50 (1978); *People v. Wipfler,* 68 Ill.2d 158, 11 Ill.Dec. 262, 368 N.E.2d 870 (1977); *People v. Dozier,* 67 Ill.App.3d 611, 24 Ill.Dec. 388, 385 N.E.2d 155, 158 (1979); and *cf. United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1222 (11th Cir.1993). See Maj. Op. at 19. This assertion, however, grossly distorts the actual reasoning contained in the opinions cited therein. The cases

cited by the Majority merely support the proposition that *Miranda* alone is not sufficient to transform a non-custodial interrogation into a custodial interrogation or a lawful detention into a *de facto* arrest, *see Sydnor*, 39 Md.App. at 463–64, 387 A.2d at 301 (stating that "*Miranda* warnings . . . [do not] operate to convert an otherwise non-custodial situation into a custodial one"); *Cummings*, 27 Md.App. at 376, 341 A.2d at 304 (determining " '[A] custodial situation cannot be created by the mere giving of modified *Miranda* warnings' "), quoting *United States v. Akin*, 435 F.2d 1011, 1013 (5th Cir.1970); *Alicea*, 381 N.E.2d at 149–50 (providing that "[t]he imparting of *Miranda* warnings was not tantamount to or suggestive of an arrest" under the circumstances of that case); *Wipfler*, 11 Ill.Dec. 262, 368 N.E.2d at 875 (holding that "[a] custodial situation cannot be created by the mere giving of *Miranda* warnings"); *Dozier*, 24 Ill.Dec. 388, 385 N.E.2d at 158 (stating that "[t]he fact that *Miranda* warnings were given is only indicative of the cautiousness of the officers and not determinative of whether the interrogation was custodial"); *Diaz–Lizaraza*, 981 F.2d at 1222 holding that "mirandizing a detainee does not convert a *Terry* stop into an arrest . . .", rather than the proposition that *Miranda* is "irrelevant" as to whether an individual is arrested. Although *Miranda* is not dispositive as to the existence of an arrest, and nor should it be, it must be considered with the rest of the circumstances surrounding a detention and interrogation under the totality of the circumstances standard.

Because I would find that Cotton's detention resulted in a *de facto* arrest, I would address whether the arrest was justified under the provisions of the "no-knock" warrant, and if not, whether there was independent probable cause for the arrest.

The "no-knock" warrant executed in the instant case named three individuals who the police were empowered to arrest, and also permitted them to "[a]rrest all persons found in or upon said premises and vehicles who are participating in violations of the statutes hereinbefore cited." This Court has interpreted the meaning of this language in the past. In our

opinion in *Griffin v. State*, 232 Md. 389, 194 A.2d 80 (1963), we determined that the above-stated provision is

> [N]o more than a directive to the police to perform duties that they should perform in the absence of any command in the warrant to that effect; namely, that in the execution of a search warrant they should arrest all person committing misdemeanors in their presence, and, after a valid arrest, they may search the arrestee as an incident thereto and seize any relevant evidence that pertains to the criminal activities of said arrestee.

*Id.* at 393, 194 A.2d at 82–83. In the present case, the police did not know until *after* Cotton's *de facto* arrest that he was committing a crime in their presence. The State cannot rely on the directive in the warrant to justify Cotton's arrest.[3] Therefore, I would find that this provision of the warrant does not provide justification independent of probable cause for Cotton's arrest.

For a warrantless arrest to be legal it must be based on probable cause. *See Pringle*, 540 U.S. at 369, 124 S.Ct. at 799, 157 L.Ed.2d at 774 (describing the probable cause standard as "long-prevailing" to protect "citizens from rash and unfounded interferences with privacy and from unfounded charges of crime."); *Dunaway*, 442 U.S. at 207–08, 99 S.Ct. at 2254, 60 L.Ed.2d at 832–33 (observing that prior to the limited exception carved out in *Terry*, probable cause was the standard for all seizures under the Fourth Amendment). We have held that a police officer can arrest an accused without a warrant if the officer has probable cause to believe that a crime has been or is being committed by an individual in the officer's presence. *State v. Wallace*, 372 Md. 137, 147, 812 A.2d 291, 297 (2002); *Woods v. State*, 315 Md. 591, 611–12, 556 A.2d 236, 246

---

**3.** Any argument based on good faith reliance on the provisions in the warrant must also fail because the *Griffin* opinion has been controlling since 1963, and pursuant to *Benik v. Hatcher*, 358 Md. 507, 531–32, 750 A.2d 10, 23–24 (2000), the police officers are presumed to know the limitations of the warrant.

(1989); *Nilson v. State,* 272 Md. 179, 184, 321 A.2d 301, 304 (1974).[4]

"Probable cause, we have frequently stated, is a nontechnical conception of a reasonable ground for belief of guilt." *Wallace,* 372 Md. at 148, 812 A.2d at 297–98, quoting *Doering v. State,* 313 Md. 384, 403, 545 A.2d 1281, 1290 (1988); *Pringle,* 540 U.S. at 370, 124 S.Ct. at 799, 157 L.Ed.2d at 775; *Edwardsen v. State,* 243 Md. 131, 136, 220 A.2d 547, 551 (1966). A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. *Wallace,* 372 Md. at 148, 812 A.2d at 298; *Woods,* 315 Md. at 611, 556 A.2d at 246; *Sterling v. State,* 248 Md. 240, 245, 235 A.2d 711, 714 (1967); *Edwardsen,* 243 Md. at 136, 220 A.2d at 550. Our determination of whether probable cause exists requires a nontechnical common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. *Doering,* 313 Md. at 403–04, 545 A.2d at 1290–91. Probable cause exists where the facts and circumstances taken as a whole would lead a reasonably cautious person to believe that a felony had been or is being committed by the person arrested. *Pringle,* 540 U.S. at 370–71, 124 S.Ct. at 800, 157

---

4. Md.Code (2001), § 2–202 of the Criminal Procedure Article states:

§ 2–202  Warrantless arrests—In general

(a) *Crime committed in presence of police officer.*—A police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer.

(b) *Probable cause to believe a crime committed in presence of officer.*—A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime.

(c) *Probable cause to believe felony committed.*—A police officer without a warrant may arrest a person if the police officer has probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer. This section is declarative of the Maryland common law governing warrantless arrests. *Collins v. State,* 322 Md. 675, 679, 589 A.2d 479, 481 (1991); *Woods,* 315 Md. at 611, 556 A.2d at 246.

L.Ed.2d at 775; *Wallace,* 372 Md. at 148, 812 A.2d at 298; *Woods,* 315 Md. at 611, 556 A.2d at 246; *Duffy v. State,* 243 Md. 425, 432, 221 A.2d 653, 657 (1966). Therefore, to justify a warrantless arrest the police must point to specific articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion. *Wallace,* 372 Md. at 148, 812 A.2d at 298; *Collins,* 322 Md. at 680, 589 A.2d at 481. To determine whether an officer had probable cause in a specific case, here probable cause to arrest, "the reviewing court necessarily must relate the information known to the officer to the elements of the offense that the officer believed was being or had been committed." *Wallace,* 372 Md. at 148–49, 812 A.2d at 298; *DiPino v. Davis,* 354 Md. 18, 32, 729 A.2d 354, 361 (1999).

In the case at bar, in order for Cotton's warrantless arrest to be valid, the officer must have had probable cause at the time of the arrest to believe Cotton was in possession of a controlled dangerous substance or concealed weapon. Section 5–101(u) of the Criminal Law Article defines "possession" as "exercis[ing] actual or constructive dominion or control over a thing by one or more persons." Md.Code (2001, 2003 Supp.), § 5–101(u) of the Criminal Law Article.

In *Collins v. State,* 322 Md. 675, 589 A.2d 479 (1991), we addressed a situation involving a warrantless arrest for possession of drugs and subsequent challenge to probable cause for that arrest. In that case, at 3:00 a.m. on September 20, 1988, Officer Holmes of the Salisbury Police Department observed five men standing by a grey Ford Mustang parked at the entrance to a car dealership. *Id.* at 677, 589 A.2d at 479–80. A second officer, Officer Ewing, arrived at the scene and, on the back seat of the Mustang, saw a 35mm film canister, which he believed contained controlled dangerous substances. *Id.* Officer Ewing asked one of the men to retrieve the canister from the car for him. *Id.* When the man stated that the canister was not his, Officer Ewing told him to open it and show him the contents, which turned out to be over twenty cellophane packets of a white powdered substance that the officer believed to be cocaine. *Id.* at 678, 589 A.2d at

480. All five men then were arrested for the possession of suspected cocaine. *Id.*

At his suppression hearing and on appeal, Collins maintained that there was no probable cause for his arrest because the mere proximity of an accused to an offender, or to incriminating evidence, would be insufficient to find the existence of probable cause. *Id.* He argued that there must be some factual basis to believe that a suspect committed a crime before that suspect may be arrested legally, and that mere suspicion, without more, would not establish probable cause. *Id.*

In our determination that the police lacked probable cause to arrest Collins, we discussed the Supreme Court case of *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). *Id.* at 682–83, 589 A.2d at 481–82. In *Di Re,* the Court held that "we are not convinced that a person, by mere presence in a suspected car, loses immunities from the search of his person to which he would otherwise be entitled." *Id.* at 587, 589 A.2d 479, 68 S.Ct. at 225, 92 L.Ed. at 216. The Court explained:

> There is no evidence that it is a fact or that the officers had any information indicating that Di Re was in the car when Reed obtained ration coupons from Buttitta, and none that he heard or took part in any conversation on the subject. . . . An inference of participation in conspiracy does not seem to be sustained by the facts particular to this case. The argument that one who "accompanies a criminal to a crime rendevous" cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passers by, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit.

Indeed it appeared at the trial to require an expert to establish that fact. . . .

*Di Re,* 332 U.S. at 593, 68 S.Ct. at 228, 92 L.Ed. at 219–20.

In the present case, relying upon our holding in *Collins* and the Supreme Court's holding in *Di Re,* I would hold that probable cause to arrest Cotton did not exist at the time of the *de facto* arrest. During their four years of surveillance on the residence at 329 Brooklyn Avenue, police never observed Cotton at the property. When police executed the "no-knock" warrant, they did not know Cotton's identity. As in *Di Re,* Cotton was arrested in broad daylight, in the yard, by a public street, in plain sight of passers by. Police did not observe him engaged in any illegal conduct, and the sole basis for detaining Cotton derives from information known about Jones, who was standing near him when police arrived. There was no evidence criminally linking Cotton to the home or to the persons named in the warrant. As the Supreme Court noted in *Di Re,* "[p]resumptions of guilt are not lightly to be indulged from mere meetings." *Di Re,* 332 U.S. at 593, 68 S.Ct. at 228, 92 L.Ed. at 220. Probable cause did not arise until after the *de facto* arrest and the search incident to arrest revealed marijuana on Cotton's person.

Therefore, because I would find that, under the totality of the circumstances, the facts surrounding Cotton's detention constituted a *de facto* arrest, which was not permitted under the warrant and was not supported by probable cause, I would suppress the admission of Cotton's statement and the drugs recovered during Detective Henning's search of Cotton's person as fruit of the poisonous tree, and reverse the decision of the Court of Special Appeals.

Chief Judge BELL and Judge GREENE authorize me to state that they join in this opinion.