884 A.2d 1236

**Elohim CROSS**

v.

**STATE of Maryland.**

**No. 720, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Oct. 27, 2005.

Laurel A. Albin (Nancy S. Forster, Public Defender, on the brief), Baltimore, for Appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: SALMON, BARBERA and SHARER, JJ.

SALMON, Judge.

Elohim Cross was charged in Prince George's County with having committed the following crimes: (1) possession with intent to distribute cocaine, (2) possession of cocaine, (3) possession with intent to distribute heroin, (4) possession of heroin, (5) possession of a firearm during and in relation to a drug trafficking crime, (6) carrying a handgun on or about his person, (7) possession of drug paraphernalia, and (8) second-degree assault.

Prior to standing trial on the above charges, Cross filed a motion to suppress evidence that was seized from his car. He contended that the warrantless search of his vehicle violated his Fourth Amendment rights. A motions judge denied Cross's motion to suppress.

On August 18 and 19, 2003, Cross stood trial before a jury in the Circuit Court for Prince George's County. Because the jury could not reach a verdict, the court declared a mistrial.

A second trial was held on October 16 and 17, 2003. The jury convicted Cross of second-degree assault but was unable to reach a verdict as to any of the remaining charges. The

trial judge declared a mistrial as to all counts, except for the one for which Cross was convicted.

■   Cross was sentenced for the second-degree assault[1] conviction to a term of incarceration of three years, with all suspended except for eighteen months.   This appeal followed.

## QUESTION PRESENTED

Did the motions court err in denying appellant's motion to suppress the evidence seized from his vehicle?

### I.

In *Faulkner v. State,* 156 Md.App. 615, 640, 847 A.2d 1216, *cert. denied,* 382 Md. 685, 856 A.2d· 721 (2004), we said:

> In [reviewing] the circuit court's denial of a motion to suppress, we are limited to the record of the suppression hearing.   We consider the evidence in the light most favorable to the prevailing party, in this case, the State.   We

---

1.   The second-degree assault conviction was based upon testimony that, subsequent to his arrest, Officer Russell Chick put Cross in the front seat of a police cruiser, whereupon Cross bit the officer's arm and spit in his face.

The question arises as to whether it is necessary to decide the legality of the search of appellant's vehicle in light of the fact that appellant was convicted of only second-degree assault.   During trial, the gun, drugs, and drug paraphernalia (recovered from appellant's vehicle) were introduced into evidence.   If the motion to suppress was granted, those evidentiary items would, of course, have been excluded.

Appellant contends that we must decide the correctness, *vel non,* of the ruling by the suppression court, because the introduction of that evidence, potentially at least, prejudiced the jury in their consideration of the second-degree-assault charge.   The State does not argue to the contrary.   *See Dorsey v. State,* 276 Md. 638, 659–61, 350 A.2d 665 (1976) (Before error can be deemed harmless, we must be convinced beyond a reasonable doubt that the error did not influence the verdict.).   We agree that the issue must be decided for the reasons advanced by appellant.   *See Bussie v. State,* 115 Md.App. 324, 344–45, 693 A.2d 49 (1997) (holding that trial court erred in refusing to sever assault charges from drug charges and explaining that jury was more likely to find defendant guilty of assault if it found that defendant possessed drugs); *Banks v. State,* 84 Md.App. 582, 591, 581 A.2d 439 (1990) (acknowledging that guns and drugs are commonly associated with violence).

accept the suppression court's first-level factual findings unless clearly erroneous, and give due regard to the court's opportunity to assess the credibility of the witnesses. We make our own constitutional appraisal as to whether an action taken was proper, by reviewing the law and applying it to the facts of the case. *When the material facts are undisputed, "we are not limited to the ground of decision relied upon by the circuit court. We may base our independent constitutional review on any ground plainly appearing from the record."*

(Citations omitted.) (Emphasis added.) *See also Wengert v. State*, 364 Md. 76, 84, 771 A.2d 389 (2001); *McMillian v. State*, 325 Md. 272, 281–82, 600 A.2d 430 (1992).

## II.

### *EVIDENCE INTRODUCED AT THE SUPPRESSING HEARING*

The motions judge considered the testimony of four police officers. Appellant presented no evidence.

#### A. *Testimony of Officer Anthony Knox*

On September 21, 2002, Officer Anthony Knox of the Edmonston Police Department was a patron at a 7–Eleven store in Bladensburg, Maryland, which was out of his jurisdiction. While standing in line, a stranger entered the 7–Eleven and asked the officer if he could speak with him. Officer Knox told the man to wait until he had paid for his purchases. The man left the store but returned shortly thereafter and told Officer Knox that it was necessary for him to speak with him immediately because there was an emergency. Officer Knox exited the 7–Eleven along with the stranger, who was "shaking real bad," "sweating extremely," and appeared to be "extremely nervous." The man advised Officer Knox that he had "just seen a high-speed car chase" and that one of the occupants of a vehicle in that chase "had displayed a handgun out the window." The informant said the car involved in the chase was in the 7–Eleven parking lot and pointed it out to

Officer Knox. Officer Knox inquired as to where the driver of the vehicle was. In the officer's words, the informant then

> stopped talking and just completely looked away from me. He started looking out to his left and turned his back on me. I asked him several more times. He looked over the shoulder and saw a gentleman talking on the phone and pointed to a gentleman talking on the [pay] telephone, that he had ... the handgun.

The person whom the informant pointed out was appellant.

Officer Knox then asked the informant to "go inside the 7–Eleven or sit in his car for his own safety" so that he could notify the Bladensburg Police Department by radio that "they had an armed subject in the area."

Officer Knox called the Bladensburg Police Department and talked with Officers Russell Chick, Shawn Morder, and Corporal Charles Cowling. He told the Bladensburg officers that "a citizen had ... approached me saying that there was a vehicle in the parking lot where there was a handgun either in the car or on the person. The citizen couldn't advise me if he had it on him or if it was in the car."

Officer Knox did not ask the informant to provide identification, nor did he later learn his identity. Moreover, he did not ask the informant if he knew appellant personally. Additionally, no inquiries were made as to how many individuals were riding in the two cars that were involved in the high-speed chase.

Officer Knox did not participate in the search of appellant's vehicle, and he did not approach appellant personally. Instead, he observed the actions of the Bladensburg police officers whom he had summonsed to the 7–Eleven parking lot.[2]

---

2. Officer Knox's testimony did not reveal when he last saw the informant. Moreover, the record is silent as to when the informant left the scene.

## B. *Testimony of Officer Russell Chick*

Officer Chick testified that he received a call from Officer Knox "advising that he was flagged down by a citizen, or advised by a citizen that there was an armed person at the payphone attached to the front of the building of 4199 Kenilworth Avenue, the 7–Eleven." Officer Chick responded to the 7–Eleven and "called for additional cars to block off . . . all entrances of the 7–Eleven." Next, he and two other Bladensburg officers "sat and watched" appellant on the payphone. The observation went on for "[s]everal minutes, maybe as much as five minutes," until it appeared to Officer Chick that appellant "was stalling, waiting for the police to leave the area."

Officer Chick then got out of his marked police cruiser and waited, out of sight, behind an electrical transformer. The other officers drove off to other locations. "Within seconds of all the officers leaving the area in their marked police cars, [appellant] walked from the payphone towards" a gray Chevrolet Corsica, which was the car that had been pointed out to Officer Knox by the "citizen." Officer Chick waited until appellant was "preparing to get into the car," and then ordered him to "put his hands on top of his head and walk away from" the vehicle. Appellant obeyed the order. Appellant was then "placed in handcuffs for officer safety" because of the nature of the information received from the informant.

Officer Chick performed what he described as "a *Terry* stop pat-down" while appellant was handcuffed, in order to ascertain if he had a weapon on his person. No weapons were found. Officer Chick then explained to the other officers, in appellant's presence, that appellant "was being detained while we investigated the report of a firearm." The two other Bladensburg officers searched the passenger compartment of appellant's vehicle, while Officer Chick obtained background information from appellant and spoke to him "about what was being done." Officer Morder next told Officer Chick "that he had seen a firearm in the glove box of" appellant's car, but that the glove box "was locked and he was unable to open it

completely." [3] A key was obtained from appellant, and the glove box was unlocked. A handgun, together with a bag containing a large quantity of narcotics, was recovered from the glove box.

On cross-examination, Officer Chick admitted that he had never spoken to the "citizen" who told Officer Knox about the presence of a handgun either before or after the search.

### C. *Testimony of Officer Shawn Morder*

Officer Morder testified that upon arrival at the 7–Eleven he spoke to Officer Knox, who said

> that a citizen came up to him and advised that he witnessed a car chase, I guess coming out of Washington, D. C., northbound Kenilworth Avenue, and the citizen advised Officer Knox that the individual who had the gun was parked in the 7–Eleven parking lot. Officer Knox pointed the car out to us and also pointed out the individual who was supposed to be driving the car.

After Officer Morder and the other officers observed appellant on the payphone for "a couple of minutes," Officer Morder realized that appellant was watching the officers. For that reason, he told the other officers, via radio, to leave the area. He too left the area but was able to still observe appellant while the latter was on the payphone. After a "couple of minutes," Officer Morder saw appellant hang up the phone and walk, at a very fast pace, toward his car. Once appellant "got to the car," Officer Morder told the other officers to "move in on the individual before he could get into the car." Appellant was then "detained, placed in handcuffs," and the interior of his vehicle was searched. In Officer Morder's words, the glove box "was partially opened," which allowed him to pull the glove compartment "open a little bit," so he could see "that there was a handgun laying inside the glove box."

---

**3.** Officer Morder told Officer Chick that he "could only see through a crack in the top of the glove box that there was a gun in there."

Corporal Cowling was advised by Officer Morder of what he had seen. Corporal Cowling obtained a key from appellant and opened the glove box. Inside the glove box, the officer recovered a handgun and a bag containing drugs.

On cross-examination, Officer Morder admitted that he had no information that appellant had pointed the handgun at anyone or at any particular thing. Officer Morder only knew that appellant had pointed the handgun out of a car window. He had no information prior to the search as to whether the handgun was loaded. Officer Morder also admitted that he personally had never talked to the informant who drew Office Knox's attention to appellant.

### D. *Testimony of Corporal Charles R. Cowling*

Corporal Cowling testified that Officer Knox told him that "he received information from a citizen concerning a person who was in possession of a handgun." He testified that, "[b]ased upon the information received from Officer Knox, [he] determined that the information was valid, it was current, and the defendant was on the payphone." He confirmed the testimony of the other officers that appellant was frisked but that no weapons were found on his person. Because no weapons were found in appellant's possession, Corporal Cowling believed "that the handgun was inside the vehicle." He then searched the vehicle, assisted by Officer Morder. According to Corporal Cowling, Officer Morder "attempted to open the glove box" by making use of an opening, about an inch or an inch-and-a-half wide, in the glove compartment door. Officer Morder then reported that he saw a gun. When the glove compartment was opened, Corporal Cowling also saw a handgun, underneath of which was a bag. Inside the bag he found drugs and money. The drugs field tested positive for cocaine. Appellant was then placed under arrest.

On cross-examination, Corporal Cowling said that he determined that the information received by Officer Knox "was valid," based upon the information Officer Knox provided, i.e., what the informant told Officer Knox and how, according to Officer Knox, the informant "was reacting."

## II.

At the conclusion of the State's evidence, appellant's counsel moved to suppress the gun and drugs found in appellant's glove box, along with drugs and drug paraphernalia found in the trunk of appellant's car after appellant's arrest.

■ In his argument, defense counsel assumed that the State was relying on the *Carroll* Doctrine to justify the warrantless search of the vehicle. That doctrine "recognizes an exception to the warrant requirement that allows the police, when they have probable cause to believe a vehicle contains contraband or evidence of a crime, to search the vehicle for the contraband or evidence of a crime and seize it, without a warrant." *Berry v. State,* 155 Md.App. 144, 176, 843 A.2d 93 (2004) (citing, *inter alia, Carroll v. U.S.,* 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and *Maryland v. Dyson,* 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999)).

Counsel for the appellant maintained that the police had searched the car based upon a "paucity of information." Counsel pointed out that the informant did not say that the gun had been fired, did not say whether it was loaded, and did not describe the gun in any detail. Defense counsel argued: "We don't know if it was a toy gun, whether it was a real gun, or what have you at that point prior to any ... search and seizure in this case." Counsel also stressed that the identity of the informant was not known. In counsel's words, "You are dealing with a situation where someone makes an accusation, someone who is not even named, someone who is not even known anymore, someone who leaves the scene,[4] is nervous, and makes an accusation and is not supported."

Defense counsel also argued that the record was devoid of any evidence concerning the informant's "motive, record, basis of knowledge [5] or anything." He concluded the *Carroll* Doc-

---

4. There was no evidence that the informant "left the scene" at any time prior to the time when the police left.

5. The informant's basis of knowledge was established by Officer Knox's testimony that the informant related what he saw during the high-speed chase.

.. 

trine phase of his argument by asserting that, looking at the totality of the circumstances, the police, at the time of their automobile search, did not have probable cause to believe that contraband was in the vehicle.

Defense counsel also argued that there were no "exigent circumstances" for the search. Without citing any case or statute, counsel appeared to assume that, apart from the *Carroll* Doctrine, a search of an automobile was permitted if exigent circumstances existed. Defense counsel argued, "If it is an exigent circumstances case, you don't have the discharge of the gun. There is no explanation for why he [the informant] was nervous."

The prosecutor argued that an "exigency" existed because of what the informant told Officer Knox. According to the prosecutor, the police could not let appellant drive away "with a handgun, possibly a loaded gun, used in a possible felony in his car." [6]

The motions judge disposed of the motion as follows:

> In looking at the totality of the circumstances, I certainly agree with the State. The citizen did what we would hope any citizen would do if they observed someone brandishing a gun outside the window of a car. He identified the car. He identified the defendant. He appeared to be nervous, and certainly he indicated that it was an emergency. He came back in and asked the officer to talk to him immediately.
>
> The officer observed the demeanor of the defendant, and I think the indicia, the totality of the circumstances, indicate that they did have the right to make the arrest.[7] Since

---

**6.** The reference to a "possible felony in his car" was not explained by the prosecutor. It is a misdemeanor to carry, concealed or openly, a handgun in a motor vehicle-absent a gun permit. *See* Md. Code Ann., Crim. Law Article, Section 4–203 (2002). The prosecutor argued that there was probable cause to arrest the defendant. Nevertheless, according to the prosecutor's argument, the probable cause arose *after* the search, i.e., once the officers saw the gun and drugs.

**7.** If what the informant told Officer Knox was sufficiently reliable to constitute probable cause to believe that appellant was transporting a

they made the arrest, it was exigent circumstances—once they made the detention it was exigent circumstances. They did have the right to go to the car. The motion to suppress is denied.

## III.

In his brief filed in this Court, appellant's counsel assumes that the only possible exception to the warrant requirement here applicable is the *Carroll* Doctrine. Defense counsel frames the issue to be decided as "whether the information supplied by the unidentified informant gave the officers probable cause to search the vehicle." Appellant argues that the evidence was insufficient to show probable cause and, in support of his argument, cites, *inter alia, Dixon v. State,* 133 Md.App. 654, 694–95, 758 A.2d 1063 (2000), and *Trussell v. State,* 67 Md.App. 23, 30, 506 A.2d 255 (1986). Appellant asserts that probable cause, when it is based upon information supplied by an informant, is determined by examination of the reliability, veracity, and basis of knowledge of the tipster. According to appellant, there was insufficient indicia of reliability, veracity, or basis of knowledge to provide probable cause for the warrantless intrusion into appellant's vehicle.[8]

---

handgun in violation of Section 4–203 of the Criminal Law Article of the Annotated Code of Maryland (2002), then appellant could be arrested for that charge without a warrant, even though the crime was a misdemeanor. *See* Md. Code Ann., Crim. Proc. Article, Section 2–203 (2001, 2005 Supp.).

8. In his brief, counsel for appellant, unlike defense counsel below, does not argue that there is an exigent circumstances exception to the warrant requirement, nor does counsel argue, as defense counsel suggested to the motions judge, that the automobile exception to the warrant requirement [i.e., the *Carroll* Doctrine] includes an exigency requirement. In any event, it is clear that the automobile exception does not include a separate exigency requirement. *See Berry v. State, supra* ("It is clear from [the cited cases] that 'the automobile exception does not have a separate exigency requirement: "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the automobile without

■ In its brief, the State makes no mention of the *Carroll* Doctrine or the automobile exception to the warrant requirement. Instead, relying on *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), the State asserts that a "warrantless arrest of an individual in a public place for a felony or a misdemeanor [9] committed in the officer's presence[ ] is consistent with the Fourth Amendment if the arrest is supported by probable cause." *See also Miller v. State*, 380 Md. 1, 50, 843 A.2d 803 (2004), and *Johnson v. State*, 142 Md.App. 172, 187, 788 A.2d 678 (2002). This is true, but the State makes no attempt to demonstrate that the search of appellant's vehicle in this case was a search incident to an arrest.

It is impossible to tell from the words used by the motions judge what exception to the warrant requirement was being utilized to justify the search of the glove compartment of appellant's car. The motions judge did not say, at least not explicitly, that he thought that there was probable cause for an arrest. The motions judge did say that the police had "the right to make the arrest," but then he went on to say, ambiguously, that "once they made the detention it was exigent circumstances . . . [giving them] the right to go [in]to the car."

In *State v. Funkhouser*, 140 Md.App. 696, 721, 782 A.2d 387 (2001), Judge Moylan, speaking for this Court, said:

> In terms of quantifiable probability, moreover, the probable cause for a *Carroll* Doctrine search is the same as the probable cause for a warrantless arrest. Whatever the possible occurrence or circumstance, the likelihood of which we are assessing, probable cause itself is a constant. It does not take more probable cause to support a warrantless arrest than it does to support a warrantless automobile

---

more." ' "). 155 Md.App. at 176, 843 A.2d 93 (citing *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999)).

9. Carrying a handgun without a permit, either covertly or openly, in a motor vehicle is a misdemeanor—not a felony. *See* Md. Code Ann., Crim. Law Article, Section 4-203(b) (2002, 2005 Supp.).

search.  The classic *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), definition of probable cause is used for both conclusions alike, with no distinction made between the predicate for an automobile search and the predicate for a lawful arrest.  Although the closely related predicates may sometimes differ slightly in terms of qualitative content or substance, they do not differ quantitatively in terms of degree of their probability.  The measure of likelihood is the same.

Here, the facts relied upon by the State in its brief to show probable cause for an arrest are exactly the same as those that could have been relied upon in an effort to show that the automobile exception to the warrant requirement was applicable.  The existence, *vel non,* of probable cause to believe that a gun was in the car, in either case, depended on the reliability of the information given to Officer Knox by his informant.  For reasons spelled out below, we need not decide whether probable cause for the search existed.

■  As mentioned earlier, appellant asserts that the automobile exception to the warrant requirement was inapplicable because the State did not demonstrate that there was probable cause to believe that the car contained a handgun at the time the search was made.  We shall assume, *arguendo,* that appellant is correct.  This, however, leaves open the question as to whether the search was justified as part of a valid *Terry* stop.  This issue was not addressed by the motions judge, nor by the parties in their briefs.  But, because the facts are not disputed, we are not limited in our analysis to the grounds of the circuit court decision.  *Faulkner v. State, supra,* 156 Md.App. at 640, 847 A.2d 1216.

■  Prior to the seizure of the gun and drugs in the glove compartment, appellant was handcuffed by the police.  The use of handcuffs constitutes a significant restraint, and their use effects a seizure within the meaning of the Fourth Amendment.  *Muehler v. Mena,* 544 U.S. 93, 125 S.Ct. 1465, 1470–71, 161 L.Ed.2d 299 (2005); *Cotton v. State,* 386 Md. 249, 265, 872 A.2d 87 (2005).  But, the mere fact that a suspect has been

handcuffed does not necessarily mean that he or she has been arrested. *Farrow v. State,* 68 Md.App. 519, 526, 514 A.2d 35 (1986) ("The distinction between a *Terry* 'stop' and an arrest, then, is not in the *method* of detention, but rather has to do with the length of the detention, the investigative activities during the detention, and whether the suspect is removed to a detention or interrogation room."). In *Cotton,* 386 Md. at 265, 872 A.2d 87, Judge Wilner, speaking for the Court, said:

This Court has recognized that society has become more violent, that attacks against law enforcement officers have become more prevalent, that there is a greater need for police to take protective measures to ensure their safety and that of the community that might have been unacceptable in earlier times, and that *Terry* has been expanded to accommodate those concerns. In *In re David S.,* 367 Md. 523, 534, 789 A.2d 607, 613 (2002), we quoted with approval this passage from *United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir.1994):

"The last decade has witnessed a multifaceted expansion of *Terry,* including the trend granting officers greater latitude in using force in order to neutralize potentially dangerous suspects during an investigatory detention. For better or worse, the trend has led to the permitting of the use of handcuffs, for the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention."

Our approval of "hard takedowns" in *David S.* and in *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988), as permissible *Terry* detentions rather than as arrests, confirms our acceptance of that observation. *See also Dashiell v. State,* 374 Md. 85, 821 A.2d 372 (2003).

Later, in *Cotton,* the Court concluded:

Cotton's reliance on the facts that he was handcuffed, placed under guard, and given *Miranda* warnings as establishing that he was *de facto* arrested either upon his initial deten-

tion or after fifteen to twenty minutes of it finds no substantial support in either Federal or this Court's current jurisprudence. Acceptance of that view would place both police officers and innocent bystanders at considerable risk.

*Id.* at 267, 872 A.2d 87.

■ Prior to the search of his vehicle, according to the uncontradicted evidence, appellant was being detained so that the police could investigate whether he possessed a handgun. Appellant was made aware of the sort of detention that he was being subjected to prior to the search. This is a significant factor in objectively determining the actual nature of the detention under the Fourth Amendment. *See Florida v. Royer*, 460 U.S. 491, 502–03, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (White, J., plurality). Here, the initial detention was brief, and appellant was not transported to another location prior to the search. Those factors are important in determining whether an arrest was made. *See Kaupp v. Texas*, 538 U.S. 626, 629–30, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003); *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *In re David S.*, 367 Md. 523, 536–37, 789 A.2d 607 (2002). In view of the above facts, we hold that appellant was detained but not arrested prior to the warrantless search.

In *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court upheld the validity of a protective search for weapons in the absence of probable cause to arrest because, in the Court's view, it was unreasonable to deny a police officer the right "to neutralize the threat of physical harm" when the officer possesses a reasonable, articulable suspicion that an individual is armed and dangerous. The Court, however, left open the question of whether such a protective search for weapons would extend to an area beyond the person in the absence of probable cause to arrest.

In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court held that, when a person was detained by the police, a protective search of the passenger compartment of a motor vehicle for weapons was permissible

under the principles articulated in *Terry* and its progeny. *Id.* at 1033, 103 S.Ct. 3469. In arriving at that holding, the Supreme Court said:

The Michigan Supreme Court appeared to believe that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile. *See* [*People v. Long*,] 413 Mich., [461] at 472, 320 N.W.2d [866] at 869. This reasoning is mistaken in several respects. During any investigative detention, the suspect is "in the control" of the officers in the sense that he "may be briefly detained against his will...." *Terry, supra,* 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring). Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile. *See United States v. Rainone,* 586 F.2d 1132, 1134 (C.A.7 1978), cert. denied, 440 U.S. 980, 99 S.Ct. 1787, 60 L.Ed.2d 239 (1979). In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. *United States v. Powless,* 546 F.2d 792, 795–796 (CA8), cert. denied, 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977). Or, as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons. *In any event, we stress that a Terry investigation, such as the one that occurred here, involves a police investigation "at close range," Terry,* 392 U.S. at 24, 88 S.Ct. at 1881, *when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected,* and the officer must make a "quick decision as to how to protect himself and others from possible danger...." *Id.* at 28, 88 S.Ct. at 1883. In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.

*Id.* at 1051, 103 S.Ct. 3469 (footnote omitted) (some emphasis added).

The holding in *Long* was:

[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. at 1883. If a suspect is "dangerous," he is no less dangerous simply because he is not arrested. If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances. *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978); *Texas v. Brown,* 460 U.S. at 739, 103 S.Ct. 1535, 1541, 1544, 75 L.Ed.2d 502 (1983) (plurality opinion by Rehnquist, J., and opinion concurring in the judgment by Powell, J.).

*Id.* at 1049–1050, 103 S.Ct. 3469 (footnote omitted). *See also Watkins v. State,* 90 Md.App. 437, 444–45, 601 A.2d 1115 (1992) ("By virtue of this rule [set forth in *Michigan v. Long*], when the police legally stop a person in an automobile, the police may 'frisk' the automobile for weapons provided the police have reason to believe that a weapon is in the car, the police have reason to believe that the suspect is dangerous, and the police confine their search to areas of the passenger compartment 'in which a weapon may be placed or hidden.' ").

■ In the case *sub judice,* the search made prior to appellant's arrest was confined to the passenger compartment of appellant's vehicle, and the gun was found in an area of the passenger compartment where a weapon was likely to be placed or hidden. Thus, the search clearly came within the scope of a search permitted by *Michigan v. Long.* This leaves the question of whether the Bladensburg police officers who conducted the search had, at the time of the search, a reasonable, articulable suspicion that the car contained a weapon and that appellant was dangerous.

In *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the question presented was whether an anonymous tip received by the police gave them a reasonable, articulable suspicion sufficient to justify a *Terry* stop of the person mentioned by the tipster. *Id.* at 268, 120 S.Ct. 1375. An anonymous caller phoned the Miami–Dade Police Department and advised that a young black male, standing at a particular bus stop and wearing a plaid shirt, was carrying a gun. *Id.* Two police officers responded to the bus stop and saw three black males "just hanging out [there]." *Id.* One of the three males, J.L., was wearing a plaid shirt. *Id.* "Apart from the [anonymous] tip, the officers had no reason to suspect any of the three [persons at the bus stop] of illegal conduct." *Id.* Nevertheless, one of the officers approached J.L., frisked him, and seized a gun from his pocket. *Id.* Justice Ginsberg, speaking for a unanimous Court, said that the tip lacked sufficient *indicia* of reliability to establish a reasonable, articulable suspicion necessary for a *Terry* search. *Id.* at 271, 120 S.Ct. 1375. The Court said:

> The tip in the instant case lacked the moderate indicia of reliability present in [*Alabama v.*] *White*[, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990),] and essential to the Court's decision in that case. The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility.... All the police had to go on in this case *was the bare report of an unknown, unaccountable informant who neither explained how he knew about the*

*gun nor supplied any basis for believing he had inside information about J.L.* If *White* was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

\* \* \*

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. . . .

*Id.* at 271–72, 120 S.Ct. 1375 (emphasis added).

In *Florida v. J.L.,* Justice Kennedy wrote a concurring opinion, in which the late Chief Justice Rehnquist joined. Justice Kennedy said:

It seems appropriate to observe that a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action. One such feature, as the Court recognizes, is that the tip predicts future conduct of the alleged criminal. There may be others. For example, if an unnamed caller with a voice which sounds the same each time tells police on two successive nights about criminal activity which in fact occurs each night, a similar call on the third night ought not be treated automatically like the tip in the case now before us. In the instance supposed, there would be a plausible argument that experience cures some of the uncertainty surrounding the anonymity, justifying a proportionate police response. In today's case, however, the State provides us with no data about the reliability of anonymous tips. Nor do we know whether the dispatcher or arresting officer had any objective reason to believe that this tip had some particular indicia of reliability.

> *If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip.* An instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a proportionate police response may be *when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring. This seems to be different from the tip in the present case. See United States v. Sierra–Hernandez,* 581 F.2d 760 (C.A.9 1978).

*Id.* at 275–76, 120 S.Ct. 1375 (emphasis added).

In the case at bar, the person who told Officer Knox that appellant had displayed a gun was anonymous in the sense that none of the police officers who testified knew his name or address. But here, there is no evidence that the informant ever made any attempt to conceal his identity. Nor was there any evidence that the informant ever left the scene prior to the officers' doing so.

The situation presented is somewhat analogous to that which arose in *United States v. Sierra–Hernandez,* 581 F.2d 760 (C.A.9 1978), which was cited by Justice Kennedy in his concurring opinion in *Florida v. J.L.*

In the *Sierra–Hernandez* case, the pertinent facts were these:

> United States border patrol agent Thomas was on duty at mid-day June 15, 1977, checking the citizenship of workers in a field two hundred yards north of the border between the United States and Mexico. While agent Thomas was thus engaged, a man, described in the record only as wearing farmer's overalls and a baseball cap and driving a late-model brown Mercedes Benz, approached him. The man pointed to a black pickup truck proceeding on a road about one hundred yards away and said, "The black pickup truck just loaded with weed at the canebreak." The canebreak was next to the field and was thickly covered by cane plants fifteen to twenty feet high. Thomas knew that the general neighborhood and the canebreak in particular were

the sites of previous incidents of drug smuggling and illegal entry of aliens. Without asking the unidentified man for his name or for any other information, agent Thomas radioed for assistance and began following the black pickup truck in his own vehicle. With the aid of two other border patrol units, Thomas stopped the pickup truck after following it about four and a half miles. The defendant was the sole occupant of the truck.

*Id.* at 762.

The *Sierra–Hernandez* court said:

Information from a citizen who confronts an officer in person to advise that a designated individual present on the scene is committing a specific crime should be given serious attention and great weight by the officer. Nevertheless, whether the information is sufficient to justify a stop must be evaluated with reference to the facts of each case, for there is no per se rule of reliability.

\* \* \*

*Moreover, although the informant did not identify himself by name, he would have been available for further questioning if the agent had judged the procedure appropriate.* Unlike a person who makes an anonymous telephone call, this informant confronted the agent directly. By thus presenting himself to the agent and doing so while driving a car from which his identity might easily be traced, the informant was in a position to be held accountable for his intervention. The reliability of the information was thus increased.

Finally, there are reasons to support the agent's failure to converse further with the informant, to ask for his name, or to note the license of his car. The suspect was in a vehicle moving away from the agent when the tip came, and we can infer from the record that it was reasonable for the agent to use his time to radio for assistance and to set off in pursuit, rather than to question the informant. There is nothing in the record which should have caused the agent to doubt the

reliability or good faith of the informant in tendering information.

*Id.* at 763 (footnote omitted).

The issue presented in *Sierra–Hernandez* was whether the stop of the defendant's vehicle was legal. *Id.* The United States Court of Appeals for the Ninth Circuit held in that case that the information received from the anonymous source was sufficient to justify the stop. *Id.*

The case *sub judice* is distinguishable from *Florida v. J.L.*, *supra.* Here the informant's basis of knowledge was established, i.e., he told Officer Knox that he saw appellant brandish a gun. Second, the informant confronted Officer Knox directly and made no effort to hide his identity. By doing so, he exposed himself to the very real possibility that he would be questioned and his identity revealed. Moreover, even if he had balked at giving his name to the police, his identity could still have been ascertained easily because he drove a car. Unlike the situation in *Florida v. J.L.*, the informant, by coming forward to the police, put himself in a position where he could be held accountable if his information proved false. Thus, the likelihood that the information was reliable was much greater than if the information had been obtained from a truly anonymous tipster such as the one described in the *J.L.* case. For this reason, an informant who makes a face-to-face report of a crime to a police officer is significantly less likely than an anonymous telephone tipster to be merely engaging in a prank or otherwise trying to mislead the police.

[9] Aside from the above, it was undisputed that Officer Knox told the Bladensburg officers who detained appellant that the informant appeared to be credible. And, in determining whether a reasonable, articulable suspicion exists for a seizure, a police officer's on-the-spot judgment is entitled to considerable deference. *See generally United States v. Arvizu,* 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

In our view, under all the circumstances, the police, at the time they searched the passenger compartment of appellant's

car, had a reasonable, articulable suspicion that appellant's car contained a gun. Because the informant told Officer Knox that appellant had brandished a handgun during a high-speed automobile chase, the police also had a reasonable, articulable suspicion that appellant was dangerous. Accordingly, we hold that under the principles set forth in *Michigan v. Long,* appellant's Fourth Amendment rights were not violated by the search of his glove compartment.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**